Doughty *v.* Miller.

---

## CHARLES DOUGHTY

*v.*

## CHARLES MILLER et al.

1. Effect must be given to a deed according to the intention of the parties, and consequently, when a deed, absolute on its face, is executed as a security, it must be declared to be a mortgage.

2. It is the intention which exists when the deed is executed that controls. No subsequent change of intention will alter its character.

3. A voluntary settlement, unreasonable in itself, will be set aside when it is made to appear that the settlor did not, for want of proper advice and instruction, fully and clearly understand and appreciate the consequences of his act.

4. A transfer of property made in fraud of creditors, while void as to them, is valid and unimpeachable as between the parties.

5. In transactions between husband and wife an equitable *assumpsit* will never be inferred contrary to their manifest understanding.

---

On final hearing on bill, answer and proofs taken orally.

*Mr. William H. Vredenburgh,* for the complainant.

*Mr. Charles H. Davis* and *Mr. John F. Hawkins,* for the defendants.

VAN FLEET, V. C.

This case stands in this anomalous condition : The complainant, in giving his evidence on the hearing, swore that the principal ground on which, by his bill, he rests his right to relief, has

Doughty v. Miller.

no foundation in fact. His bill was filed to procure a decree declaring that a deed, absolute on its face, was executed by him as a mortgage, and that inasmuch as he owed the grantee nothing then, and has not subsequently become indebted to her, the deed should be declared to be a nullity and a reconveyance ordered.

The facts which the complainant makes the foundation of his right to relief, as set out in his bill, are the following : He is nearly seventy-six years of age and illiterate, being unable either to read or write ; he has been twice married ; by his first wife he had eleven children, all of whom are still living ; she died in 1869, and he married his second in January, 1872 ; his second was his junior, she being, at the time of their marriage, about thirty years of age and he about fifty-seven. No issue was born of this marriage. The complainant, at the time of his second marriage, owned a house and lot at Fair Haven, in the county of Monmouth, which he occupied as his home. On their marriage, his second wife went there to live and continued to live there until she died. In March, 1890, the complainant and his wife verbally agreed to engage in the business of keeping a summer boarding-house on the premises where they lived. As part of this arrangement, it was agreed that the capacity of the house should be enlarged by additions and improvements, and used for the purposes of the business, and that the parties should each contribute their time and labor to the business, and share and bear its profits and losses equally. After this agreement was finally concluded, the bill says that the wife

"proposed that your orator should convey the house and premises to her by deed, so as to secure to her, against any accident, the payment of the share, which would fall to her in said business, and that she would reconvey the same to your orator upon the settlement of that business."

The complainant acceded to this proposition, and subsequently, on the 6th day of March, 1890, conveyed his house and lot, through the pastor of the church of which he and his wife were members, to his wife by deeds absolute on their face. Both deeds were recorded within two or three days after their execution. The land conveyed was afterwards improved by the erection of

Doughty v. Miller.

additions to the house and other structures at a cost of over $2,000. From the summer of 1880, up to and including the summer of 1890, the business of keeping a summer boarding-house was carried on on the premises. It was successful, the profits each season being in excess of $500. The wife received all the money and kept all the profits. No settlement was ever made, and the wife never accounted to her husband for the profits, nor paid him any part of them. He never asked for a settlement, nor for any of the profits. The wife died child-less and intestate on the 24th day of November, 1890, leaving one brother and three sisters, who are her heirs-at-law and the defendants to this suit.

Taking the facts embraced in the preceding statement to be true, and assuming that they comprise all the material facts of the case, there can be no doubt that they make a case which entitles the complainant to a decree. For no principle of equity jurisprudence is more firmly settled, than that effect must be given to a deed according to the intention of the parties, so far as the law will allow, and consequently when a deed, absolute on its face, is executed as a security, it must be declared to be a mortgage. The effect to be given to such an instrument must, however, be determined by the intention of the parties existing at the time of its execution. If they then meant that it should operate as a conveyance, and pass the title absolutely, no subse-quent change of intention will make it a mortgage. The defend-ants deny both of the principal facts on which the complainant's right to relief rests. They deny that an agreement was ever made between the complainant and his wife to carry on any business for their joint benefit, and they also deny that the con-veyance to the wife was executed as a security. The issue thus made up casts the burden of proof on the complainant. The deeds, standing alone by their own inherent force, show plainly that the complainant's object in executing one of them, and pro-curing the other to be executed, was to pass the title to the land from himself to his wife absolutely and unconditionally. That is the construction which they must receive, and that is the legal effect which must be attributed them, especially as they have

Doughty *v.* Miller.

stood undisputed for over ten years, until it is shown, by clear and convincing evidence, that such was not their purpose, but that they were executed merely as a security.

Now as to the proofs. The complainant, in less than three months after his bill was filed, made an affidavit to obtain an injunction to prevent the defendants from further prosecuting an action of ejectment they had brought against him to recover the land in question, in which he swore that he and his wife, in the year 1880, determined to carry on the business of keeping a summer boarding-house on his premises, for their joint and equal benefit and profit, and that they, in the words of the affidavit,

"mutually and verbally agreed that they, the said premises, together with the furniture and personalty, should be conveyed to and vested in the said Sarah, so that in case of any accident to deponent, either from death or otherwise, she, said Sarah, should be secure for the payment of her share of the proceeds of that business, and that upon the settlement or closing of the business the property was to be reconveyed and revested in deponent."

The facts here verified are identical, in substance, with those alleged in the bill. The complainant's affidavit was sworn to on the 3d day of April, 1891, and he was examined as a witness on his own behalf on the 29th day of October, 1891. To render it easy to understand such parts of the complainant's evidence as will now be quoted it is, perhaps, necessary to say that the complainant made the conveyance to his wife through the Rev. Jacob Fried, and that Mr. Fried went with the complainant to the office of the counsel who drew the deeds and was present when the complainant gave instruction for their draft. The complainant, while under direct examination, was asked this question:

"At the time you made the deed to Mr. Fried, and Mr. Fried made the deed to your wife, what was said between your wife and yourself as to the object of the conveyance—the reason why the title to the property was to be put in the name of your wife? Now, go on, and tell the whole story?"

Which he answered as follows:

"Well, it was the persuasion of Annie Minton and my wife for me to do it, and they insisted upon me to do it; I didn't know anything about the arrange-

Doughty *v.* Miller.

ments for conveying property; I was entirely ignorant of it; I didn't know that I was giving my property away, nor I didn't intend to give it away; I knew nothing about the law and no points of law, and nothing about conveying property."

Shortly afterwards he was asked:

" I would like to know whether there was any understanding between your wife and yourself, that the deed which was made to her should be made to her to secure her for her share of the profits of the business, and that when you paid her her share of the profits of the business the title to the property was to be made over to you?  Was there anything of that kind said between you and your wife?"

His answer was: "No, there was not."   And then, near the close of his direct examination, this question was put to him:

" What your counsel wants you to do is to state all that took place between you and your wife about putting the title to your property in her name before you started to go to Senator Nevins' office—he wants you to tell everything."

And he replied: " Well, she advised me to do so, and I went and did it."   Then followed this question: " Is that all?"   To which he replied: " That is all I know about it."   He also testified that when he instructed his counsel to draw the deeds, he told him he wanted to convey his property into the hands of his wife.  Comment is unnecessary.  The simple repetition of this evidence shows that the complainant's own evidence sweeps away the case made by the bill, root and branch.  It does more—it shows that the complainant is a self-contradicted witness.  He swore one way in his affidavit and directly the opposite on the witness-stand.  He stands self-contradicted on the vital fact of his case.

But it is insisted that, even if the complainant has failed to prove the very foundation fact on which his right to relief rests, still the court ought, under the pressure of the peculiar hardships of the case, and to protect the complainant against the consequences of his own folly, to set the deeds aside as improvidently made.  The contention is this: That if the transaction is looked upon from the standpoint most favorable to the defend-

ants, and the deeds are regarded as a settlement by the husband on his wife, still, as they embraced all the land he owned, and passed the title absolutely and unconditionally, and contained no provision that the land should revert in case he survived her, the settlement should be adjudged to be unreasonable and improvident, and for that reason should be set aside. There are cases in which voluntary settlements, unreasonable in themselves, have been set aside on the ground that they had been improvidently made, but they are all cases in which it was made to appear that the settlor did not, for want of proper advice and instruction, fully and clearly understand and appreciate the consequences of his act. *Garnsey* v. *Mundy, 9 C. E. Gr. 243*, is of this class. There a woman, about twenty-one years of age, at the instance of her mother and uncle, and without any advice except such as they gave her—and they merely told her that to execute the deed would be for her good—made a deed, by which she stripped herself of all her property, and conveyed it in fee to her mother, without power of revocation, to be held in trust by the mother for the grantor's children. The grantor neither proposed nor suggested the conveyance. "Indeed," says the chancellor, "it appears she knew nothing of it until it was presented to her for her signature." The proofs made it entirely clear that all the parties, the grantor and her mother and uncle, misapprehended the effect of the deed, and that instead of its being what they supposed it was, it differed, in two important respects, so widely from what they supposed as to have an effect directly the reverse of that which they intended. The deed was therefore set aside because it was not "the pure, voluntary and well-understood act of the grantor's mind."

But that case, it will be perceived at a glance, differs from the one under consideration in every essential point. There is no pretence that the wife proposed or suggested the form of the conveyance or that she had anything whatever to do with its preparation or execution. The only connection she had with the transfer was to advise that it be made. The part she took in it, as described by the complainant himself, was this : "Well, she advised me to do so and I went and did it." She requested and he

acceded. She used no art, deceit or improper influence. The complainant himself prescribed the form of the conveyance. The deeds were drawn under instructions that he gave himself in person. It is not claimed that his instructions were not followed; on the contrary, he says they were. He says he told his counsel that he wanted to convey his property into the hands of his wife. Not only so, but it is undisputed, that he went to the office of his counsel accompanied by the person whom he intended to use, and did use, in passing the title to his wife. The deeds purport to be founded on a money consideration. The complainant, at the same time that the deeds were executed, transferred to his wife all his personal property, except a few articles not worth over $100. These things all go to show, with almost conclusive force, that the deeds correctly express the purpose that was in the complainant's mind and heart when they were executed. He meant to put his property in the name of his wife to place it beyond the reach of his creditors. That this was his purpose, or one of them, I think the proofs plainly show.

Just prior to the time when he transferred his property, claims had been asserted against him, arising out of a business carried on by his brother-in-law and himself, under the name of Doughty & Company, which he thought he ought not to pay, but which he feared he might be compelled to pay. This much he admits, but he denies that he made the transfer to delay or defeat the enforcement of these claims. But, for the reason already stated, his denial must be regarded as almost entirely without probative force. The proofs, as a whole, produce a strong conviction in my mind that one of the complainant's purposes in making the transfer was to defraud his creditors. His principal witness swore that both the complainant and his wife told him, about the time the transfer was made, that that was the purpose for which it was made. The truth of this statement is very strongly corroborated by evidence which is inherent in the transfer itself. Though no money was paid, or intended to be paid, both deeds purport to have been made for a money consideration. The transfer embraced not only all of the complainant's land, but likewise all of his personal property that was liable to seizure by

execution.   It is thus seen, that in making the transfer, he acted precisely as a debtor, in his situation and of his capacity, would who wanted to defeat the collection of debts which he thought he ought not to be required to pay.   No principle of law is more firmly established, nor rests upon higher principles of morality or more obvious considerations of public policy, than that which declares that a transfer of property, made in fraud of creditors, while void as to them, is good between the parties.   The statute of frauds, by its express letter, makes such transfers valid and unimpeachable as between the parties.   So that if this were a case which, in consequence of its hardship, strongly appealed to our sympathies and naturally aroused a desire to extend help, still it is manifest that no help could be given without a plain subversion of a positive rule of law.

The complainant makes another claim.   He asks to be reimbursed for the money he has expended in paying taxes assessed against his wife's land, and also in making improvements thereon. Without stopping to inquire whether or not the proof in support of this claim is sufficient to show that all the money so expended was the complainant's money, I think it is quite enough to say in disposing of this claim that it is neither averred nor proved that it rests upon a contract.   The facts, as narrated by the complainant himself, show, I think, clearly and conclusively, that whatever expenditure he made for these purposes, he made as a volunteer, not at the request of his wife, but of his own volition, and without a contract for repayment or any expectation of repayment.   His claim does not rest on a promise made by his wife, nor on a just expectation arising out of the circumstances under which the expenditures were made, but is, obviously, the outgrowth of the situation in which he found himself after the death of his wife.   The rule, I think, must be considered settled that in transactions between husband and wife an equitable *assumpsit* will never be inferred contrary to their manifest understanding.

The complainant's bill must be dismissed, with costs.