JAMES M. CUMMINGS et al., appellants,

*v.*

JAMES JACKSON et al., respondents.

1. A contract in writing to secure a debt which is duly specified therein, in which the parties expressly declare their intention to create a lien by way of mortgage upon certain real estate particularly mentioned and described in the writing, upon the failure of certain conditions fully set forth in the contract, is an equitable mortgage, and upon non-payment and breach of the conditions may be foreclosed in the ordinary way in a court of equity, and the interest of the mortgagors in the lands so pledged sold to satisfy the debt.

2. When an agreement has been made that a mortgage shall be subject and subordinate to a subsequent lease of the same lands, provided and so long as certain payments mentioned in the agreement are made on the mortgage, a failure to make such payments will, *ipso facto*, restore the priority of the mortgage.

3. When a purchaser of lands assumes the payment of a mortgage thereon, and deducts the amount of the same from the consideration paid, he is precluded from assailing the validity of the mortgage assumed, or denying that the amount assumed by him and withheld from the purchase-money is a good and subsisting lien upon the lands.

---

On appeal from a decree in *Jackson* v. *Cummings*, advised by Washington B. Williams, advisory master.

*Messrs. Dickinson, Thompson & McMaster,* for the appellants.

*Mr. William I. Lewis,* for the respondents.

The opinion of the court was delivered by

NIXON, J.

The controversy in the case under review grows out of the foreclosure of an instrument in writing, made on the 14th day of August, 1882, between Sylvanus D. Brown and Mary Brown, his wife, and James Jackson, the respondent, in order to secure to Jackson the payment of $1,900 on the 1st day of August, 1883, and not sooner unless the parties should elect to sooner repay the same, which writing was duly acknowledged and recorded. For the payment of this sum the said instrument pledged nineteen shares of stock in the Layton Iron Company, the rents, royalties and profits and increase derived by Mary Brown by virtue of certain leases of mining properties, known as the Pellington mine and the Brown mine, then held under leases by the Midvale Ore Company; the right, title and interest of Sylvanus D. Brown in a certain agreement then made and afterwards to be formally executed with one John Huyler, and finally stipulated and provided:

"That in case the Midvale Ore Company should surrender up the aforesaid lease of the said Brown mine or either portion thereof, or the same should become forfeited in any manner, the said instrument providing both for surrender and forfeiture, then the transfer, assignment and conveyance hereinbefore made of the rents, royalties, profits &c. arising out of said lease, as collateral security for the debt hereinbefore mentioned, shall be deemed to operate upon the real estate composing the said tract known as the Brown mine, and being the subject-matter of the said lease, and this conveyance shall be held and construed to be a lien by way of mortgage upon the said real estate, as and for the said collateral security, subject to all the conditions and limitations herein contained, in so far as they may be applicable, the said two parcels of real estate being particularly bounded and described as follows, viz., [description of lands.]"

No note or bond was given with this instrument.

On March 12th, 1886, Sylvanus D. Brown and Mary Brown, his wife, executed a mortgage on the same premises in question

and other property to James Jackson, Charles Dupont Breck and George Fisher, to secure the payment of $10,000, which was afterwards assigned to Breck in trust for himself, Jackson and Fisher. On March 14th, 1891, Mary Brown and her husband made a lease of all the iron ores and metals and mineral substances in or upon the lands in question to A. G. N. Vermilya, reserving an annual rent therefor of $2,500, and providing for the forfeiture and making void of said lease on the failure to pay said rent. On the same day it was mutually agreed by the Browns, Vermilya, Jackson and Breck, that the rent reserved in said lease should be paid to Jackson until the " mortgages " given by the Browns to Jackson, and to Jackson, Breck and Fisher, should be paid, and that the mortgages should be subordinate to the lease to Vermilya " so long as the conditions and covenants of said conveyances are kept and performed by said Vermilya, his heirs, assigns or legal representatives."

On March 17th, 1891, Vermilya and wife executed a mortgage of his interest in all the ores, metals and mineral substances in or upon the lands in question to James M. Cummings, to secure the sum of $25,000, and on March 24th, 1891, Vermilya conveyed all his interest under the Brown lease to the Midvale Mining Company, subject to the conditions and reservations of rent contained in the lease from the Browns. On November 14th, 1893, Mary Brown and her husband conveyed all their right, title and interest in the Brown mine lands to James M. Cummings, Laura M. Rosevelt and Ira D. Cummings, the appellants.

The bill to foreclose the aforesaid instrument was filed August 8th, 1894, and all the parties interested were made defendants, and the case was heard upon the bill, the answer and cross-bill of the appellants, and the answer and cross-bill of the Midvale Mining Company, and the respective answers of Breck and Mary Brown, and the proofs, the bill having been taken as confessed against the other defendants.

The chancellor decreed that the instrument set forth in the bill of complaint is a valid and subsisting encumbrance and lien

by way of mortgage upon the estate, rights and appurtenances therein described against all the defendants, and that there was due, on the date of the decree, to the complainant James Jackson $3,534 for principal and interest; that the mortgage executed by Mary Brown and her husband, to James Jackson, Charles Dupont Breck and George Fisher, to secure the payment of $10,000, is also a valid and subsisting lien upon the estate, ores, mining rights &c., and that the sum of $8,738.25 found due thereon is entitled to be secondly paid; that the mortgage of Allen G. N. Vermilya and wife to James M. Cummings, on which the sum of $33,617.90 was due, is entitled to be thirdly paid; that "all the estate, rights, title and interest which the said Mary Brown and Sylvanus D. Brown mortgaged to the said James Jackson by the said instrument bearing date of the 14th day of August, 1882, in the tracts of land described therein, be sold to raise and satisfy the several sums of money due," and that the said defendants and each of them stand absolutely barred and foreclosed of and from any equity of redemption in the said mortgaged premises, to wit, of, in and to "all the estate, ores, mining rights, title and interest which the said Mary Brown and Sylvanus D. Brown, her husband, mortgaged to the said James Jackson by said instrument bearing date August 14th, 1882, when sold as aforesaid by virtue of this decree." The foregoing are the only parts of the decree pertinent to the questions raised by the appeal.

From each and every part of this decree, three of the defendants (the appellants) appealed, upon the following grounds—*first*, that the instrument bearing date August 14th, 1882, is not a mortgage, and does not contain words and language sufficient to convey an interest in real estate; *second*, that if held to be a mortgage upon real estate, that it conveyed only an estate for the life of the mortgagors and did not convey a fee therein; *third*, that if there was anything due under that instrument which could be held to be a lien upon the land, it was a much smaller amount than that named in the decree, and that some of the money paid to Jackson should have been credited on that instrument; *fourth*, that if the instrument is not a mortgage of real

-estate, no interest in the lands described can be sold under it; *fifth,* that if the instrument is not a mortgage, then no decree can be made in this case establishing the amount due upon any other lien on the premises, and *sixth,* that no counsel fee or costs for searches should have been allowed.

It will be perceived that the primary question raised by the appeal is whether the instrument foreclosed is a valid and subsisting encumbrance and lien by way of mortgage upon the real estate, rights and appurtenances described therein, and the answer to it will, at the same time, dispose of the fourth and fifth grounds of appeal.

. Counsel for the appellants have founded their argument that the instrument upon which this suit was brought is not a mortgage, and does not contain words sufficient to create a lien upon real estate, upon the common-law definition and construction of a mortgage formerly held in England and in some of the earlier decisions in this state. But the later and now almost universally-accepted definition of a mortgage was given by Mr. Justice Depue, in the case of *Woodside* v. *Adams, 11 Vr. 417, 422,* where the learned judge said: "It may now be considered the established doctrine of the courts of this state that a mortgage of lands is not a common-law conveyance with a condition, but a mere security for the mortgage debt, the legal estate being considered subsisting in the mortgagee only for that purpose." Mr. Justice Story, in *Flagg* v. *Mann, 2 Sumn. 486, 533,* said: "If a transaction resolves itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is, in equity, a mortgage."

Another distinction in mortgages should not be overlooked. We refer to that class called equitable mortgages. *Jones Mort. (4th ed.) § 162,* says:

"It has been noticed that a conveyance accompanied by a condition contained either in the deed itself, or in the separate instrument executed at the same time, constitutes a legal mortgage at common law. In addition to these former instruments, which are properly entitled to the designation of mortgages, deeds and contracts, which are wanting in one or both of these characteristics of a common-law mortgage, are often used by parties for the purpose

of pledging real property or some interest in it as security for a debt or obligation, and with the intention that they shall have effect as mortgages. Equity comes to the aid of parties in such cases and gives effect to their intentions. Mortgages of this kind are called equitable mortgages. There are many kinds of equitable mortgages, as many as there are varieties of ways in which parties may contract for security by pledging some interest in lands. Whatever the form of the contract may be, if it is intended thereby to create a security, it is an equitable mortgage."

This definition is peculiarly apt when applied to the instrument upon which this suit was founded. It was a writing expressly designed by the parties making it to secure a debt by pledging real property in the event that other anticipated sources of revenue mentioned therein failed of realization, and the two tracts of real estate upon which, in the language of the instrument, " this conveyance shall be held and construed as a lien by way of mortgage," are specifically designated and described therein at length by metes and bounds. There is no ambiguity in the phraseology of the instrument from beginning to end. It specifies the debt it is intended to secure, and that its purpose is to create a lien by way of mortgage is clearly expressed, and the lands upon which it is to take effect are particularly described. No requisite of an equitable mortgage is lacking.

We do not find in the record any issue framed by the pleadings or raised by the proofs to which the second ground of appeal is applicable, and its discussion is, therefore, not necessary to the disposition of the case.

The validity of this instrument as an equitable mortgage being sustained, the next question is whether the conditions upon which the debt secured by it was made payable have been fulfilled by the grantors, and whether payment or satisfaction, in whole or in part, has been obtained in some other way.

It clearly appears by the proofs that nothing was realized from the other securities mentioned in the instrument. The nineteen shares of the Layton Mine Company became worthless, and the property of the company was sold and the stockholders lost all. The proposed agreement with John Huyler was never consummated, and the complainant received nothing from the Pellington mine, and the lease became forfeited, and in 1888 the

leases of the Brown mine were also forfeited to Mrs. Brown, and thus all the conditions existed under which this instrument was intended to operate as a lien by way of mortgage upon the real estate described therein.

The agreement made by the complainant and Breck with Vermilya that his lease should be paramount to the mortgage of the complainant and the Breck mortgage, was only

"provided and so long as the rents or royalties are paid, as provided in said lease, by said Allen G. N. Vermilya aforesaid, and in said agreement of even date, made between said Mary Brown and Sylvanus D. Brown, her husband, said Allen G. N. Vermilya and the undersigned [Jackson and Breck]."

It was not contended or proved that these rents or royalties have been paid as stipulated in the said lease and agreement, and therefore they cannot operate as an impediment to the foreclosure of the complainant's mortgage or affect its priority.

The third ground of appeal is that a less amount is due upon the mortgage than that found by the court. This contention is based upon an alleged misapplication of the payments made to the complainant, Jackson. There is no dispute as to the amount paid, and no claim is made that the full amount has not been credited in the schedule of account annexed to the chancellor's decree and forming part thereof. The payments were all made to James Jackson, the complainant, in pursuance of the provisions of the agreement dated March 14th, 1891, between the Browns, Vermilya, the complainant and Breck. There were two mortgages recognized in the agreement, one to the complainant for $1,900, and one to the complainant, Breck and Fisher for $10,000, and the payments were to be applied to these until they should be paid and satisfied, but nothing whatever was said in the writing as to which should be paid first. They were all applied to the second mortgage by Jackson. Both Jackson and Breck testify that it was mutually agreed between the Browns and themselves that these rents and royalties should all be applied to the payment of the second mortgage of $10,000. This evidence is given further weight by the fact that while the payments were largely in excess of the amount sufficient to pay

the first mortgage, yet no request or demand for its surrender and cancellation was ever made. It does not, therefore, appear that the application of these payments to the reduction of the second mortgage was contrary to the mutual understanding of the parties interested. But, in the absence of any such agreement, there being no proof or contention that any directions were given as to how the money should be applied, the payee, Jackson, had the right to apply it to either of the two mortgages as he might see fit. *Bird* v. *Davis, 1 McCart. 467.*

It further appears that the appellants were not ignorant of the fact that all of these payments had been applied on the second mortgage. When, on the 14th of November, 1893, the deed for part of the lands described in the complainant's mortgage was executed by Mary Brown and her husband to the appellants, a complete schedule of the amounts due upon each of the mortgages was made out, and upon it all the several payments and their application to the reduction of the second mortgage are set forth, and it forms one of the exhibits in the case. No question was made at that time about the correctness of this statement, and it corresponds in all material respects with the schedule which accompanies and forms a part of the chancellor's decree, excepting, on account of dates, the differences in the amount of accrued interest, and a mistake in stating the amount of complainant's mortgage to be $2,000 instead of $1,900, as in the decree, which inures to the benefit of the appellants.

In this deed from the Browns to the appellants, the following words appear :

"Subject, nevertheless, to two several mortgages, now good and valid liens upon the above-described premises, the first of said mortgages being made and executed by the parties hereto of the first part to James Jackson, to secure the payment of two thousand ($1,900.00) dollars and interest, dated August 14, 1882, and recorded in Passaic county clerk's office on same day, in Book S 2 of Mortgages, page 197, and the other of said mortgages being made and executed by said parties hereto of the first part, to James Jackson and others, to secure the payment of ten thousand dollars and interest, dated March 12th, 1886, and recorded in said county clerk's office, on Mar. 12th, 1886, in Book B 3 of Mortgages, page 395, the aggregate amount of principal and interest due and unpaid on said mortgages at this date being nine thousand six hundred and eighty-three dollars and seventy-four cents, which the said parties of

Cummings v. Jackson.

the second part hereby assume, and agree to pay, as recorded, together with the interest to grow due thereon, as part of the consideration hereinabove expressed, hereby binding themselves, their legal representatives and assigns therefor."

Holding the above words to mean what they clearly import, would, of course, prevent the appellants from assailing the validity of the complainant's mortgage or denying that it was at the time of the purchase a lien upon the land, the amount due thereon having been deducted from the consideration paid, and the mortgage designated in their deed as a good and valid lien upon the premises. From these disabilities the appellants endeavor to escape by insisting that the words "as recorded," in the assumption clause of the deed, relate to certain conditions in the mortgage, and in the lease between the Browns and Vermilya. We cannot see any force in the contention made or any special significance in those words as used in the deed. They may be viewed as merely referring to the fact that the mortgages were of record. They are in that sense superfluous, but unnecessary words may be found in almost every written instrument. But granting that the words relate to conditions in the complainant's mortgage, or in the lease of the Brown mine to Vermilya, it cannot alter the situation. We have already stated that those conditions were not fulfilled. That the Midvale Ore Company's lease became forfeited is not open to doubt, and whether by voluntary surrender, or by dispossession proceedings, as Jackson testifies, is not material, as the instrument provided that if it should become forfeited in any manner the lien upon the lands should attach. The agreement to subordinate the mortgages of the complainant and that of Breck to the lease made to Vermilya was only so long as the rents or royalties were kept paid. These payments ceased in 1893, almost a year before the foreclosure proceedings were commenced. We find nothing to impair the legal effect of the assumption clause in the deed to the appellants.

The matters referred to in the sixth ground of appeal rested wholly in the discretion of the court.

The decree should be affirmed.

*For affirmance* — THE CHIEF-JUSTICE, COLLINS, DEPUE, DIXON, GARRISON, GUMMERE, LIPPINCOTT, LUDLOW, VAN SYCKEL, ADAMS, BOGERT, HENDRICKSON, NIXON—13.

*For reversal*—None.