60 N.J. Super. 199 (1960)
158 A.2d 529
RONALD A. WELSH AND JAMES T. WELSH, JR., PLAINTIFFS-APPELLANTS,
v.
GRIFFITH-PRIDEAUX, INC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1959.
Decided March 8, 1960.
*200 Before Judges GOLDMANN, CONFORD and HANEMAN.
*201 Mr. Walter J. Hunziker, Jr., argued the cause for plaintiffs-appellants (Messrs. Hunziker & Hunziker, attorneys).
Mr. Clifford W. Starrett argued the cause for defendant-respondent Griffith-Prideaux, Inc. (Messrs. Schenck, Smith and King, attorneys).
Mr. John J. Gibbons argued the cause for defendants-respondents Alex Richard Lanyi, et ux. (Messrs. Crummy, Gibbons and O'Neill, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
The basic question projected before the trial court in this case was whether a certain written agreement between plaintiffs (hereinafter referred to as the "Welshes") and the defendant corporation (hereinafter referred to as "Griffith") dated December 15, 1955, as recast by an agreement between the same parties dated July 10, 1957, constitutes an equitable mortgage, with the consequent right of redemption by the Welshes, upon default, from the obligations due thereunder to Griffith; or either (a) a non-security transaction classifiable as an option from Griffith to the Welshes to buy any of 11 certain lots, as held by the trial court and contended by defendants Griffith and Lanyi, or (b), as alternatively argued by them, a sales contract on condition, upon which the Welshes have defaulted.
The appeal raises the additional issue as to whether the determination of the question posed should not have been reserved for decision after trial, as dependent upon resolution of disputed issues of fact, rather than upon defendants' motion for summary judgment, as was here done by the Chancery Division.
Much of the factual background in this case is undisputed. One of the plaintiffs, James T. Welsh, Jr., was employed by Griffith as a real estate salesman from 1953 to 1958. During that period he also engaged independently in several *202 real estate ventures with his brother, the other plaintiff, Ronald H. Welsh. In one of these ventures the plaintiffs (through James) obtained an option from one Cameron in January 1955 to purchase a six-acre tract of land with a small frontage on Woodruff Road in Morris Township, suitable for high-class residential construction, for $11,000, conditioned, however, upon their undertaking to apply for and obtain, no later than April 8, 1955 (or within 30 days thereafter), approval by the local planning board "of building plans." The Welshes obtained approval from the planning board April 1, 1955 of a plan for subdivision of the property into 11 building plots on a road to be constructed therein, conditional upon their posting a road-completion surety bond with the township authorities in the sum of $18,505. As the date for closing title with Cameron approached the Welshes were apparently unable to obtain financing elsewhere and consequently entered into the arrangement with Griffith which underlies this litigation. An oral agreement was arrived at concurrently with the closing of title with Cameron in May 1955. A written agreement, signed December 15, 1955, formalized this understanding. The parties agree the writing accords exactly with the oral understanding.
Basically, Griffith was to put up the purchase price and take title in its own name; plaintiffs would build the road and other necessary developmental improvements required, as well as the homes on the lots; Griffith would have the exclusive right of sale of the dwellings thus erected; Griffith would be "reimbursed" by the Welshes for the purchase price of the property, together with interest at the rate of 5% from May 11, 1955 (closing date), payable semi-annually, and for any real estate taxes and insurance and maintenance expenses paid by Griffith; the Welshes were to pay taxes and insurance premiums in the first instance and also a $500 fee to Griffith "by way of commission for negotiating the purchase" of the property and for "assisting" plaintiffs "in consummating the said transaction." Paragraph 2 of *203 the agreement explains that Griffith took title "due to the fact that the Party of the Second Part [Welshes] was unable to raise sufficient money to consummate the said deal, and consequently, requested the Party of the First Part [Griffith] to negotiate the deal for them, subject to the conditions which hereinafter follow." Griffith agreed to "hold the property for the benefit of" the Welshes "for a period of two years," subject to the contract terms. A plan for "release" of lots by Griffith by conveyance to the Welshes was specified. In each case the latter would obtain a construction loan and get their deed for the lot upon payment to Griffith of $1,000 and execution of "a second mortgage" for $1,000. This arrangement would continue until Griffith was paid its balance due in full. Plaintiffs could at any time pay Griffith in full and have a deed for the entire property, but Griffith would retain the exclusive right of marketing the dwellings for six months thereafter. Paragraph 4 of the agreement reads as follows:
"4. The parties of this Agreement hereby stipulate and agree that if the Party of the Second Part should fail to improve the said property and construct the eleven dwellings as hereinbefore mentioned, within the period of two years as aforesaid, then the Party of the First Part reserves the right to retain the aforesaid property as its own, to all uses, intents and purposes, and to develop or sell the said lots, and the Party of the Second Part agrees that the Party of the First Part shall not be liable, either at law or in equity, under any clause of this Agreement."
After the taking of title from Cameron, the Welshes found themselves unable on their own credit to obtain the necessary performance bond for the road construction, and it became necessary for Griffith to enter into the bond along with the Welshes as co-principals, undertaking to complete the road satisfactorily by June 6, 1957.
Plaintiffs made unsatisfactory progress with the road, but were able to obtain from the township an extension of time for its completion until June 6, 1958. Thereupon the Welshes and Griffith entered into a new agreement of July 10, 1957, *204 which provides in its first-numbered paragraph that "[t]he agreement dated December 15, 1955 by and between the parties is terminated." At that time only one lot had been conveyed by Griffith under the agreement. A number of "whereases" are recited in the preamble of the 1957 agreement, of which the first two read:
"Whereas, on May 9, 1955, Griffith-Prideaux and Welsh entered into a contract whereby Griffith-Prideaux paid the consideration in the amount of Eleven Thousand ($11,000.00) Dollars for a certain six-acre tract of land, which said Welsh had under contract of purchase, and for which payment the said Welsh was unable to raise sufficient money; and
Whereas, said agreement set forth that Griffith-Prideaux agreed to hold the property for the benefit of Welsh for a period of two years under certain terms and conditions as therein set forth."
Epitomized, the new agreement provided, additionally, the following: plaintiffs agreed they "owe[d]" Griffith $9,000 "for money advanced for a portion of this property * * *" and undertook to pay 6% interest thereon, as well as the same carrying charges mentioned in the original agreement; they were to rough grade, cut and fill the entire road by August 15, 1957, and install utility pipes and curbs by November 16, 1957, subject to extension of time for certain contingencies, failing which their rights under the contract "would cease and terminate" and the property "remain in the name" of Griffith, free of any claim by or through the Welshes, time being fixed as of the essence; provisions for release of lots and for permission to prepay the moneys due Griffith, comparable to those of the first agreement, were specified; Griffith continued to have exclusive sale rights for a period extending to six months after termination of the agreement, on a 5% commission basis, for payment of which the Welshes were responsible, and the latter were also to pay Griffith $300 or 1% of the sale price on each dwelling sold "as an additional service charge for the financial service rendered" to the Welshes by Griffith. If, by June 8, 1958, the road was not satisfactorily completed but there was *205 sufficient money in an escrow account, made up from stipulated payments to be made by the Welshes on releases of lots, to cover the cost thereof, the contract might be extended six months for such completion and release of Griffith on the performance bond; otherwise the contract would terminate June 7, 1958 and Griffith have the right to retain the remaining property as theretofore provided.
The Welshes failed to make the installation of utility pipes as agreed upon by the date required, and Griffith notified them by letter of February 5, 1958 that they had failed to perform the conditions of the July 10, 1957 agreement and that Griffith was therefore holding the property free and clear of any claim by the Welshes. In the meantime, five or six of the lots had been conveyed by Griffith to the Welshes pursuant to the two agreements and sold to purchasers of dwellings. In several of these transactions the Welshes executed $1,000 second mortgages to Griffith reciting they were given "to secure a part of the purchase price therefor."
The township found the road construction work done by plaintiffs not in accordance with specifications and called upon Griffith to make good on the bond. The latter contracted with another construction firm to do the necessary work for an estimated expense of $17,338. An affidavit submitted on its behalf on the motion for summary judgment indicates it had or would sustain still additional expenses due to plaintiffs' default of approximately $5,300.
James T. Welsh, Jr. submitted an affidavit on the motion, wherein, as a real estate valuation expert, he estimated the original $11,000 price of the Cameron property as being "conservatively" only 50% of its market value at the time of sale in its status as subdivided with official approval. He deposed that plaintiffs were "forced" into executing the second agreement. In July 1957, when the second agreement was made, the ten lots still in Griffith's nominal ownership were each worth $5,000, "due to a general price rise in real estate and the development of other land in the *206 immediate area." The Welshes' then equity in the property was estimated at $20,000, plus the prospect of profit of several thousand dollars per house on the prospective construction of ten homes. They have received participating commissions for sales of homes in the tract of only $1,500, but have expended $25,000 in its development. As of the date of the affidavit Welsh estimated the five lots still held by Griffith to be worth $6,700 to $7,000 each, or a total of at least $32,500. The "$300 or 1%" extra fee required by Griffith as a condition of the second agreement was termed by the latter an "aggravation fee" when exacted and involved the rendition of no financial services. Ronald Welsh corroborated some of these recitals by affidavit.
A reply affidavit on behalf of Griffith indicated that James T. Welsh, Jr., as an employee of Griffith, received half of each commission earned by Griffith on sales of homes in the tract, but the latter carried all overhead and advertising out of its share. It was denied that Griffith "forced" plaintiffs to enter the second agreement, and averred that the latter solicited it therefor, offering the $300 or 1% additional fee as an inducement.
The gravamen of the complaint filed herein was a prayer for a declaration that the plaintiffs made a mortgage to Griffith and are entitled to redeem the property upon payment to that company of what it advanced under the agreements. It also asked that the "service charges" be declared usurious interest payments. Plaintiffs further sought to set aside the conveyance of a lot in the tract by Griffith to the defendant Lanyi, who was asserted to have had notice of plaintiffs' equity therein.
In granting defendants' motion for summary judgment, the trial court said:
"What the plaintiffs did here was in effect to assign their option with one Cameron to Griffith and cause Cameron to convey the premises directly to Griffith. At that time there was no prior or concurrent written agreement between the plaintiffs and Griffith with respect to the transaction. There was an oral understanding which *207 was reduced to writing approximately 7 months later in December 1955 * * *
The agreements between plaintiffs and Griffith are not at all ambiguous. They are full, complete and clear. * * *

* * * * * * * *
It is clear from the pleadings, affidavits, and exhibits, that there was no loan by Griffith to the plaintiffs, that the conveyance from Cameron to Griffith was not security for any such loan. The plaintiffs had in fact no more than an option arrangement with Griffith which they had exercised with respect to 5 of the 11 lots conveyed to it. Payments by the plaintiffs of interest, taxes and the like under the circumstances exhibited here are not proof of the existence of a debt underlying the security of the conveyance in question  they plainly appear to be part of the consideration for the option agreement. There was no payment of interest on a debt, hence no usury."
We are unable to agree that the foregoing conclusions were justified as a matter of law upon genuinely undisputed facts or inferences therefrom negating a construction of the arrangement between the parties as an equitable mortgage. The function of a motion for summary judgment is not to procure the summary determination of disputed issues of fact, even though the evidence is strongly one way, since "the judge does not function as a trier of fact in determining a motion for summary judgment." Judson v. People's Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954). In our opinion, the texts of the agreements and the affidavits submitted on both sides created a material issue of fact which was required to be decided upon plenary proofs at a hearing, not on the showing made on the papers before the court.
At the very least, the agreements do not unambiguously spell out a transaction necessarily distinct and different from a mortgage, as held by the trial court. For example, paragraph 2 of the first agreement explains that the conveyance from Cameron was to Griffith, rather than to the Welshes, because the latter were "unable to raise sufficient money to consummate the deal" and so "requested" Griffith "to negotiate the deal for them"; Griffith was to "hold the said property for the benefit of plaintiffs" for a period of two years; the plaintiffs were to pay interest, taxes, insurance *208 and maintenance, currently, just as an ordinary mortgagor would, and these obligations were stated in unconditional terms; and the provision for "release" of lots is typical of those commonly found in construction mortgages. The July 1957 agreement even more significantly suggests a security transaction. It recites at the outset that the first contract was one whereby Griffith "paid the consideration" for the property (rather than purchased it; compare the first agreement); that the Welshes "owe" Griffith $9,000 for the money advanced, as well as taxes and interest on the money. These last-mentioned "past due" items are required to be paid at once. These provisions tend to indicate an absolute debt owing by the Welshes to Griffith.
The agreements give Griffith a right of termination and retention of the property upon default but do not purport to make that right its exclusive remedy. It is not clear that, if, for example, the lands had declined in value Griffith could not have sued the Welshes for the money advanced rather than make their satisfaction from the remaining lots in their name.
In the leading modern case relevant to this inquiry, J.W. Pierson Co. v. Freeman, 113 N.J. Eq. 268, 270-1 (E. & A. 1933), Mr. Justice Heher said for the court:
"If a transaction resolves itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is, in equity, a mortgage. If a deed or contract, lacking the characteristics of a common law mortgage, is used for the purpose of pledging real property, or some interest therein, as security for a debt or obligation, and with the intention that it shall have effect as a mortgage, equity will give effect to the intention of the parties. Such is an equitable mortgage. Cummings v. Jackson, 55 N.J. Eq. 805, 809; Peugh v. Davis, supra [96 U.S. 332, 24 L.Ed. 775]. To prevent undue advantage through inadequacy of consideration, courts of equity are steadfast in holding that a conveyance, whatever its form, if in fact given to secure a debt, is neither an absolute nor conditional sale, but a mortgage, and that the grantor and grantee have merely the rights, and are subject only to the obligations, of the mortgagor and mortgagee. Mooney v. Byrne, 163 N.Y. 86; 57 N.E. 163, 165. The character of the instrument is determined by the intention of the parties at the time of its execution. Frink v. Adams, 36 N.J. Eq. 485; Doughty v. Miller, 50 N.J. Eq. 529; *209 Guilford-Chester Water Co. v. Guilford, 107 Conn. 519; 141 A. 880, 883; 19 R.C.L. 266. While it is true that it does not require express words to create an equitable mortgage, where the intention to create such a lien is evident, yet it must clearly appear from the instrument or the surrounding circumstances, at the time of entering into the same, that the maker of the instrument intended that the property therein described is to be held, given, or transferred as security for the obligation. Managas v. Albertucci, 235 U.S. 81; 35 S.Ct. 95, 59 L.Ed. 139; New Orleans National Banking Association v. Adams, 109 U.S. 211; 3 S.Ct. 161, 27 L.Ed. 910; Hibernian Banking Association v. Davis, 295 Ill. 537; 129 N.E. 540. An equitable mortgage, therefore, is created by the agreement of the parties."
Fundamental to a resolution of the question as to the intent of the parties to make a mortgage is whether an absolute debt subsisted from one to the other of the parties concurrently with the entry into the disputed agreement. If so, a mortgage is strongly indicated. Id., 113 N.J. Eq., at page 272; 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 1196, p. 583. However, there may be a mortgage notwithstanding absence of personal liability of the mortgagor. See Vreeland v. Dawson, 55 N.J. Super. 456, 465 (Ch. Div. 1959). As indicated, the face of these agreements does not unequivocally reveal whether or not there was an absolute debt. The fact that the value of the property taken is greater than the sum advanced by a grantee is a circumstance pointing to a mortgage arrangement. 4 Pomeroy, op. cit., supra, at pp. 583-584. The same authority stresses that the nature of any particular transaction wherein an alleged incumbrancer takes title, as mortgage vel non, must largely depend upon its own circumstances, "for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings, or as disclosed by extrinsic evidence." Id., § 1195, p. 575.
It must certainly be conceded that there is strong evidence from the face of the agreements and the surrounding circumstances that Griffith did not go into or stay in this deal for the purpose of acting as a financier of the Welshes' *210 acquisition of the tract. It was obviously motivated by the commissions to be earned by selling 11 homes in the $30,000 and up category. This circumstance, amplified and clarified by oral proofs at a retrial, may tend to indicate that the transaction was basically not a security arrangement, but rather a combination option and sales-agreement. This is peculiarly the kind of case in which proof of extrinsic facts may lend definitive meaning to the language of the writings of the parties. See Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953).
As the plaintiffs dawdled on the project Griffith became drawn into the development far beyond its original contemplation, becoming a principal on the performance bond and ultimately being forced to make good on that obligation. Whatever the original or supplemental agreements may be found to have been intended to be by the parties when executed, a fair consideration of the matter of Griffith's over-all equities vis a vis the Welshes, under the circumstances as they ultimately developed, may call for enforcing the forfeiture arrangement bargained for in the supplemental agreement as entirely equitable and fair in the special situation presented. Cf. Dorman v. Fisher, 52 N.J. Super. 70 (App. Div. 1958), affirmed 31 N.J. 13 (1959). But this is a determination which should await a full airing of the background of this matter at a hearing. And query: was there an effective subsequent release by the later agreement of any originally existing right of redemption under the first agreement? See Gavin v. Johnson, 131 Conn. 489, 41 A.2d 113 (Sup. Ct. Err. 1945). This, too, is an issue of fact.
The case as a whole requires a new approach through reformulation of the issues by pretrial order and a plenary hearing on the merits. The issues of alleged duress, usury, and as to the rights of the defendant Lanyi should be comprehended in the new pretrial order and disposed of on the basis of the facts and law as developed at the hearing.
Reversed.