**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1310-18T3

SAMUEL PAGLIANITE,

     Plaintiff-Respondent,

v.

NARSAN LINGALA,

     Defendant-Appellant,

and

ANJU MEHTA, MOSHE VAKNEEN,
and SAROJA LINGALA, n/k/a
SAROJA ALKANTI,

     Defendant-Respondents,

and

STATE OF NEW JERSEY,

     Defendant.

_____

Submitted March 30, 2020 – Decided May 21, 2020

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. F-007616-17.

Howard A. Gutman, attorney for appellant.

Graziano & Campi, LLC, attorneys for respondent Samuel Paglianite (Kathleen McCormic Campi, on the brief).

Bhavini Tara Shah, attorney for respondent Saroja Lingala, n/k/a Saroja Alkanti, joins in the brief of respondent Samuel Paglianite.

PER CURIAM

In this appeal from a foreclosure judgment after a bench trial, defendant Narsan Lingala challenges the court's finding of an equitable mortgage. Lingala agreed to purchase the construction firm owned by plaintiff Samuel Paglianite. After a $25,000 down payment, Paglianite accepted Lingala's promissory note for the $225,000 balance. The court found the parties also intended to secure the note with a mortgage on Lingala's interest in his residence.[1] But, Lingala refused to execute the form of mortgage Paglianite proposed. Instead, he unilaterally executed and recorded a revised form intended to eliminate

---

[1] Lingala's former wife, defendant Saroja Alkanti, retained an interest in the residence with priority over Paglianite's. She does not challenge the trial court judgment.

A-1310-18T3

Paglianite's right to foreclose if Lingala defaulted. Paglianite discovered the revisions only after Lingala failed to make the first payment under the note.

Lingala principally argues the parties never agreed to the mortgage's essential terms. He asserts his revision was a counter-offer that Paglianite deemed unacceptable. He contends that absent a meeting of the minds, there was no legal mortgage, nor were there grounds to impose an equitable mortgage. Rather, the court should have rescinded the entire transaction, because the parties' disagreement pertained to an essential element.

We are unpersuaded. Although Lingala refused to execute Paglianite's proposed form of mortgage, an equitable mortgage may still be grounded in a party's promise to provide a mortgage. Although we discern insufficient evidence in the record to support the court's finding that Lingala actually agreed to Paglianite's form, agreement as to the precise form was not necessary, so long as Lingala agreed in principle to provide a mortgage. However, the trial court applied the wrong standard of proof in finding an equitable mortgage by a preponderance of the evidence. Rather, the clear and convincing standard applies. Nonetheless, a remand is unnecessary, because we are convinced that Paglianite retained the right to foreclose, even under the mortgage as modified by Lingala.

I.

Over a period of several months, beginning in late 2015, Paglianite endeavored to sell his company, Dimensional Dynamics Corp. (Dimensional), to Lingala. Lingala was a software engineer by training. A lawyer who previously represented Lingala and Mark Emme, a contractor at Dimensional, in separate legal matters, introduced Lingala to Paglianite. A deal that involved the lawyer as a co-investor with Lingala eventually fell through. However, while these efforts to strike a deal proceeded, Paglianite allowed Lingala and Emme to operate the business and occupy his firm's former offices.

Lingala teamed up with another investor.[2] Lingala ultimately entered a stock purchase agreement with Paglianite. The $250,000 price represented $140,000 for the corporation, and $110,000 in credit that was extended to the buyers.[3] On June 17, 2016, Lingala executed the promissory note. He promised to pay $225,000 at the rate of $25,000 a month, beginning July 1, 2016. No

---

[2] The investor was defendant Moshe Vakneen, who funded the $25,000 down payment. Vakneen evidently promised to lend Lingala $100,000, also secured by a mortgage on Lingala's home. For reasons not essential to this appeal, the court found that the Lingala-to-Paglianite mortgage took priority over the Lingala-to-Vakneen mortgage.

[3] Although the agreement was admitted into evidence, neither party included it in the record on appeal.

A-1310-18T3

interest would accrue if payments were timely.  In case of default, which included payments over ten days late, the note entitled Paglianite to accelerate the debt, and to collect late charges, default interest of twelve percent, and attorney's fees incurred to enforce collection.

The note did not refer to a mortgage.  Nonetheless, Paglianite testified that Lingala had agreed to allow him to place a $200,000 lien against his house.[4]

Paglianite asserted that his attorney had negotiated terms of the mortgage agreeable to Paglianite.  He learned from Emme, "Lingala had altered the form of the mortgage that was agreed upon to be executed."  Yet, Paglianite's statement did not explicitly say the form was agreed upon by Lingala, as opposed to Paglianite and his own lawyer.[5]

Rather, Paglianite reaffirmed at trial a prior statement that he and Lingala disputed the form of mortgage.  In his verified complaint in his separate breach of contract action on the note, Paglianite said, "As late as June 20th and June 21, 2016, the parties disagreed about the form of mortgage to be executed and filed."  Paglianite further testified that he and Lingala "[d]isagreed at various

---

[4]  Paglianite did not explain why the lien would be for $25,000 less than the amount due under the note.

[5]  Paglianite did not introduce into evidence his proposed form of mortgage.

times." He also conceded that competing forms were exchanged on June 20th. Nonetheless, he testified, "[u]ltimately, it was my understanding that there was agreement," without explaining what prompted that understanding. Conceivably, Paglianite was referring to his understanding – really a misunderstanding – that Lingala accepted Paglianite's form when Lingala informed him on June 21 that he had recorded the mortgage, without disclosing he had modified it.

On June 21, 2016 – the same day Paglianite admitted the parties still disagreed – Lingala modified the form of mortgage he received in Word format. Most significantly, Lingala – acting without legal counsel – modified the form, to provide that Paglianite could enforce his rights under the mortgage if he declared a default with Lingala's consent. The modified form stated:

> **Lender's Rights Upon Default.** If the Lender declares that the Note and this Mortgage are in default with my consent, the Lender will have all rights given by law or set forth in this Mortgage. This includes the right to do any one or more of the following:
>
> (a) Manage the Property and get upto [sic] his remaining mortgage amount.

Notably, Lingala omitted the right to foreclose. The provision identified no other recourse upon default. The modifications also defined default as failure

A-1310-18T3

to make a payment within forty-five days of its due date (contrary to the ten-day period in the Note).

However, Lingala did not modify a separate provision that generally granted Paglianite all rights typically granted mortgagees. The provision stated:

> **Rights given to Lender.** I mortgage the Property to the Lender and assign to the Lender those rights as hereinafter set forth. This means that I give the Lender those rights stated in this Mortgage and also those rights the law gives to lenders who hold mortgages on real property.

Lingala's modifications also mischaracterized the Note, stating that the "Note provides for monthly payments of $10,000 starting October 2016."

Lingala testified he modified the mortgage because Paglianite's form was "one-sided"; he discovered irregularities in Dimensional's business; and he needed to shield his home from foreclosure. He said he would never consent to a foreclosure. However, Lingala effectively acknowledged that a mortgage on his home was part of his agreement with Paglianite. He stated, "[T]he mortgage was only to satisfy the deal, the company sale. And that's what was required by him, and that's what I [did]."[6]

---

[6] The transcript states the word after "what I" was indiscernible. We presume it was "did" or something equivalent, based on the context.

As noted, Lingala promptly informed Paglianite that he recorded the mortgage, and sent him a copy. But, neither Paglianite, nor his attorney to whom he sent a copy, reviewed it until weeks later, after Emme informed Paglianite that Lingala had modified the mortgage. By that time, Paglianite had transferred all the Dimensional stock, and Lingala failed to make the July 1 payment.

Emme testified that he understood Lingala had agreed to pledge his house as collateral and he believed it was unwise, because they were already finding it difficult to fund the business's operations. Emme testified, "I didn't approve of [Lingala] putting his house up as collateral. . . . I still thought it was crazy that somebody would put their house up, and there were further discussions about that also." Emme recounted that Lingala called him at home after he recorded the mortgage to tell him that he modified Paglianite's form without disclosing that fact. Emme testified that Lingala said, "It looks like everything is going to come together and the mortgages are going to be accepted." When Emme said he thought it was unwise for him to put up his house, Lingala replied, "Mark, relax, you know what I do. You know I altered. They'll never know I altered the document."

In his foreclosure complaint, Paglianite sought judgment based on the recorded mortgage; alternatively, he sought reformation of the mortgage, or

imposition of an equitable mortgage. At trial, the principal issue was whether Paglianite had a valid mortgage entitling him to foreclose. After Paglianite, Emme, and Lingala testified, the court entered judgment based on an equitable mortgage.

The judge found that "[b]oth parties testified, and it is undisputed, that the promissory note would be secured by collateral . . . [the collateral being] the defendant's residence . . . ." The court also found that, notwithstanding his later modifications of the form, "defendant had agreed to plaintiff's version of the mortgage form." The judge relied on her understanding of Paglianite's and Emme's testimony. The court held that Lingala's version of the mortgage "would negate the remedies of foreclosure . . . which were negotiated by plaintiff and agreed to by defendant to secure the note." The court stated it would "not reward the conduct [of] the defendant in his effort to avoid foreclosure on his property." The court imposed an equitable mortgage, finding "by a preponderance of the evidence . . . that plaintiff has established a prima facie case of his right to foreclose." To the extent the note and recorded mortgage differed, the court held that the note controlled. On that basis, the court awarded Paglianite attorney's fees.

## II.

We hesitate to disturb the trial court's fact-finding after a bench trial, particularly given the court's opportunity to assess witnesses' demeanor. See Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). Yet, we are not bound to affirm findings that are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of No. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). We review legal issues de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). That includes interpretation of a mortgage, since it is a contractual undertaking. See Kieffer v. Best Buy, 205 N.J. 213, 222 (2011) (stating "[t]he interpretation of a contract is subject to de novo review by an appellate court").

Having carefully reviewed the trial record, we discern insufficient support for the trial court's finding, ostensibly based on Paglianite's and Emme's testimony, that Lingala agreed – orally, we presume – to Paglianite's proposed form of mortgage. First, Emme simply did not testify that Lingala accepted Paglianite's form. Second, Paglianite's testimony that it was his understanding that ultimately, Lingala agreed to his form, makes sense only if it referred to

Paglianite's misunderstanding that the mortgage Lingala recorded was the one Paglianite proposed. Paglianite stated in his verified complaint for breach of contract, and reaffirmed at trial, that he and Lingala were at loggerheads over the mortgage form as late as June 20 and 21st.

However, there was ample support for the court's more general conclusion that Lingala agreed to provide a mortgage against his home, as security for the note. Paglianite testified that Lingala agreed to do so. So did Emme. Lingala balked when it came time to execute Paglianite's proposed final form of mortgage. But, his statement to Emme, after he recorded the modified version, reflected Lingala's own understanding that a mortgage was an essential element of the deal.

Our courts of equity will impose an equitable mortgage to enforce an oral promise to give a mortgage, where the promisee has partly performed by lending money in reliance on the promise, and has otherwise relied on the promise. Cauco v. Galante, 8 N.J. 233 (1951) (affirming judgment enforcing equitable mortgage based on promise of mortgage); Rutherford Nat'l Bank v. H. R. Bogle & Co., 114 N.J. Eq. 571, 573-74 (Ch. 1933); Clark v. Van Cleef, 75 N.J. Eq. 152, 154 (Ch. 1908); see generally 29 N.J. Prac., Law of Mortgages § 9.4 (2d ed. 2019) (discussing promises to mortgage); 4 Powell on Real Property § 37.19

11

(2020) (stating "[a]n unperformed agreement to give a mortgage on identified land invites the help of equity," and "[w]here the parties have intended to create a security interest, equity decrees the specific lien enforceable by the creditor as an equitable mortgage").[7]  "The whole doctrine of equitable liens or mortgages is founded upon that cardinal maxim of equity which regards as done that which has been agreed to be, and ought to have been, done."  Rutherford Nat'l Bank, 114 N.J. Eq. at 573-74.  The terms of the promised mortgage must be sufficiently definite to be enforced.  Cf. Heim v. Shore, 56 N.J. Super. 62, 71 (App. Div. 1959) (declining to enforce oral agreement to sell land upon a "liberal mortgage plan" without clearly establishing "amount, amortization payments, and interest rate").

---

[7]  An equitable mortgage may arise under other circumstances, such as where the legal mortgage suffered some formal defect, see 29 N.J. Prac., Law of Mortgages §9.1 (2d ed. 2019), or where the parties structured a transaction – such as a sale and leaseback – that, despite its formal structure, was intended to create a mortgage, see Zaman v. Felton, 219 N.J. 199, 216-17 (2014) (reviewing sale-leaseback arrangement as possible equitable mortgage); see also J.W. Pierson Co. v. Freeman, 113 N.J. Eq. 268, 270 (E. & A. 1933) (stating "[i]f a transaction resolves itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is, in equity, a mortgage"); Welsh v. Griffith-Prideaux, Inc., 60 N.J. Super. 199, 208 (App. Div. 1960); Manfredi v. Manfredi, 12 N.J. Super. 207 (Ch. Div. 1951).  However, we focus here on equitable enforcement of a promise to give a mortgage.

A-1310-18T3

Part performance and reliance takes the promise outside the Statute of Frauds, which, historically, required a writing to create an enforceable promise to give a mortgage. See Cauco v. Galante, 6 N.J. 128, 137 (1951); Feldman v. Warshawsky, 125 N.J. Eq. 19, 20 (E. & A. 1938). Notably, the modern Statute of Frauds permits enforcement of an oral promise to give a mortgage, if proved by clear and convincing evidence. N.J.S.A. 25:1-13(b).[8]

Here, the promise to provide a mortgage was sufficiently definite, as the note already provided the repayment terms and the interest rate, which was chargeable only in the event of default. There was also no dispute that the amount of the mortgage debt was $200,000. As for the part performance requirement, Paglianite not only made the loan; he allowed Lingala to operate the business before closing; and Paglianite later transferred stock ownership. Furthermore, Lingala's effort to erase Paglianite's promised security by modifying the mortgage form did not override his prior promise.

> An equitable lien or mortgage once created is not waived, expressly or impliedly, by reason of the promisor giving, and the promisee receiving, a formal mortgage which, by reason of fraud, mistake, or

_____

[8] The provision states, "An agreement to transfer an interest in real estate . . . shall not be enforceable unless . . . a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence."

> otherwise, is ineffectual in giving the specific lien which the former intended to give and the latter intended to receive; nor is it merged in any such instrument.
>
> [Rutherford Nat'l Bank, 114 N.J. Eq. at 578.]

However, the trial court erred in applying the preponderance-of-the-evidence standard. "In cases where parol evidence is admissible to establish the existence of an equitable mortgage, the evidence must be clear and convincing." Estate of Hammerle v. Dir., Div. of Taxation, 22 N.J. Tax 342, 349 (Tax 2005) (citing Vreeland v. Dawson, 55 N.J. Super. 456, 462 (Ch. Div. 1959)); see also Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 164 (App. Div. 1960) (stating that "clear and convincing" standard applies to proof of a promise, conduct and reliance, to estop party from invoking Statute of Frauds defense).

Nonetheless, we need not remand for the trial court to apply this more demanding standard of proof. That is because we are satisfied that the mortgage that Lingala recorded, despite Lingala's intention to the contrary, granted Paglianite the right to foreclose. Lingala's subjective intent to render the mortgage nugatory is of no consequence in interpreting the mortgage. See Friedman v. Tappan Dev. Corp., 22 N.J. 523, 531 (1956) (stating "[i]t is not the real intent but the intent expressed or apparent in the writing that controls");

14

Heim, 56 N.J. Super. at 72-73 (stating "[p]arties are not bound by what they think, but rather by what they say").

We recognize that Lingala attempted to condition the foreclosure upon his consent. But, we are not satisfied that he accomplished his goal. He altered the provision addressing remedies in the event of default to state, "If the Lender declares that the Note and this Mortgage are in default with my consent, the Lender will have all rights given by law or set forth in this Mortgage." Based on the placement of the comma, the "with my consent" clause modifies the lender's declaration of default. Thus, if Paglianite declared default with Lingala's consent, then Paglianite would have all rights given by law or set forth in the mortgage.

However, that provision did not expressly condition Paglianite's rights on Lingala's consent; nor was the provision the only one describing Paglianite's rights. The "Rights given to Lender" provision stated that Lingala gave "the Lender those rights stated in this Mortgage and also those rights the law gives to lenders who hold mortgages on real property." Unquestionably, the law generally entitles mortgage holders the right to foreclose on real property. Lingala did not condition that right on his consent.

15

In interpreting an agreement, we eschew an interpretation that would render a provision meaningless. Rather, "'all parts of the writing and every word of it will, if possible, be given effect.'" Washington Const. Co. v. Spinella, 8 N.J. 212, 217-18 (1951) (quoting 9 Williston on Contracts (Rev. ed.), sec. 46, p. 64). We therefore reject an interpretation that would render the "Rights given to Lender" meaningless. Rather, we conclude that Lingala's consent was a sufficient, but not a necessary condition of a default declaration. Therefore, Paglianite was entitled to foreclose on the basis of the recorded mortgage.

To the extent not addressed, Lingala's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1310-18T3