56 N.J. Super. 62 (1959)
151 A.2d 556
DAVID J. HEIM AND HILLBROOK ACRES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v.
ANNA SHORE, SIDNEY SHORE, GERTRUDE R. SALTZMAN AND RAYMOND SALTZMAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1959.
Decided May 22, 1959.
*64 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. John B. Mathews argued the cause for plaintiffs-appellants.
Mr. George P. Walker argued the cause for defendants-respondents (Mr. Raymond Saltzman, attorney).
The opinion of the court was delivered by FREUND, J.A.D.
This is an appeal from a judgment of the Superior Court, Chancery Division, dismissing plaintiffs' action at the conclusion of the six-day presentation of their case. Plaintiff, David Heim, a real estate broker who has engaged in building and development activities, sued for specific performance of an alleged oral contract by which the defendants agreed to convey to him on January 1, 1957 *65 a 50-lot tract of land in Cinnaminson Township, Burlington County. In the alternative, plaintiffs claimed damages for breach of the contract or damages on the ground that defendants were unjustly enriched. The contract was purportedly made on or about June 10, 1954 with Heim personally, but he subsequently conveyed his interest in the agreement to the plaintiff corporation, Hillbrook Acres, Inc., of which he became a stockholder. The legal title to the land in question is held by the defendants Anna and Sidney Shore, but the former's sister, Gertrude R. Saltzman, and her husband, Raymond Saltzman, apparently have full power to deal with the land and to enter into a binding contract looking toward its sale. Mrs. Saltzman is in the business of "giving mortgages" and has in the past financed a number of land development projects in South Jersey.
Plaintiffs' general contention is that in 1954, when defendants agreed by written contract to sell to Heim for development purposes a 14-acre tract (hereinafter the "Woodside Lane piece") for $30,000, there also was an oral contract or "verbal understanding" that when the Woodside Lane piece was developed and sold to homeowners, Mrs. Saltzman would then convey 50 lots of the adjacent 80-acre tract for further development and sale by him. The adjacent tract (hereinafter "tract 2") contained 119 lots, but plaintiffs only argue that Mrs. Saltzman agreed to convey 50 of these lots on January 1, 1957, no time having been fixed for the transfer of the remaining 69 lots. There is nothing in the record to indicate the acreage of the 50 lots in question.
The defendants in their answer and in the pretrial order denied that the alleged oral agreement ever existed, asserted the defenses of the statute of frauds and laches, claimed that plaintiffs made expenditures in connection with the commencement of the development of tract 2 as volunteers and that plaintiffs were trespassers thereon, and maintained in the alternative that plaintiffs were at all times unable and without adequate means to perform their obligations under the contract.
*66 The fact picture, as drawn by plaintiffs' proofs, emerges fairly clearly. In 1952 or 1953, while employed with the South Jersey Mortgage Company, Heim first met Mrs. Saltzman. In the fall of 1953 he established his own real estate brokerage office with a partner and represented her in purchasing property of about 60 acres. There were also a number of other land sales and mortgage transactions in which Heim and Mrs. Saltzman worked together. To indicate that they customarily used oral agreements, Heim testified that in 1953 she had sold him two tracts of land in Haddon Township known as the Cuthbert Park development, and that the second tract in the latter project had been conveyed to him pursuant to a verbal understanding that it would be so conveyed after the development of the first tract.
Early in 1954 plaintiff was interested in purchasing a lot for his own home, and Mrs. Saltzman showed him the Woodside Lane piece and the adjacent 80-acre tract. She suggested that he develop the land, and she would finance the project by selling it to him for a small down-payment, taking back a purchase money mortgage. By this time Heim had started in the building business. He testified that Mrs. Saltzman had approached him with charitable intentions and had said "it is nice to be able to help someone get started."
The two went to the office of John H. Heckers, an attorney who had represented parties previously concerned with tract 2. He had in his possession various maps which they had come to purchase. This meeting took place in early 1954, and at the trial Heckers recalled that the substance of the conversation was that Mrs. Saltzman was "backing" plaintiff in the development of the land, the reference being to both tracts.
In June 1954 Mrs. Saltzman conveyed the approximately nine-acre Woodside Lane piece to Heim for his check of $1,000 and a mortgage of $27,000, which was eventually discharged. The original $30,000 price had been based on *67 1,500 frontage feet at $20 per foot, but there was a reduction of lot frontage when sub-division plans were rejected by the Cinnaminson Township planning board. The rejection resulted in a decrease in the number of lots in this section from 14 to 11, and in added paving, sewerage and construction work, for all of which Heim was to receive a credit, in addition to the $2,000 reduction in price. This credit was to be applied to the down payment on the 50 lots in tract 2. The conveyance of the Woodside Lane piece was the first step in the execution of the agreement between plaintiff and Mrs. Saltzman for the sale of both tracts at $20 per frontage foot, on similar liberal mortgage terms.
Through a series of mesne transactions, title to the Woodside Lane section finally went into Hillbrook Acres, Inc., organized in 1955 by Heim and Melvin Funk and their wives. Heim and Funk each beneficially owned one-half of the corporate stock. One Kelley subsequently bought a one-third interest, and later, in 1956, Heim, John Sitzler, Sr. (an experienced builder) and John Sitzler, Jr., bought out Funk and Kelley. Heim and Sitzler, Sr., each owned 45% of the stock and the younger Sitzler, 10%. In a written agreement of March 2, 1956, within which Heim and the Sitzlers defined their respective rights as shareholders, it was stipulated that Heim held "an oral option on 80 acres of ground situate adjacent to the present plan of Hillbrook Acres, Inc.," and that the Sitzlers were to share, in proportion to their stock holdings, in his rights under the "said option."
Construction began on Heim's home in the Woodside Lane section in 1954. In August 1955 construction in that tract commenced on the first home for a customer. Sales continued nicely into 1956, and construction was started on 8 of the 11 lots in the section. One other lot was devoted to Heim's home, as noted, and another to that of Sitzler, Jr. Thus, by June 1956, there was only one lot still available in the Woodside Lane piece. One Sharp became interested in a lot in plaintiffs' development, but did not like *68 the location of the last available lot in Woodside Lane. He asked Heim about a lot in the large tract.
By this time plaintiff and Mrs. Saltzman had agreed on further details on the sale of tract 2. Mrs. Saltzman had promised some time in 1955 that 50 of those lots were to be conveyed to Heim on January 1, 1957. This date was chosen because defendants, for tax purposes, wanted no further sales in 1956. A subdivision map covering 23 of the 50 lots was conditionally approved by the planning board. At this juncture Heim consulted Mrs. Saltzman, and it was agreed that plaintiff should accept Sharp's deposit and begin construction of his home on one of the 23 approved lots. The contract with Sharp called for possession by late 1956, Heim testifying that Mrs. Saltzman had told him that a leasing arrangement with Sharp could be worked out to cover the interim period between completion in late 1956 and the conveyance to plaintiff on January 1, 1957. Foundation work on the Sharp home commenced in August 1956. A building permit was issued therefor on September 4, 1956, reciting that "Dave Heim" was the owner as well as the contractor.
Subsequently in 1956 a contract was also made with a party named Beyer for a house to be erected on another of the 23 lots. Plaintiff had the two lots rough-graded, excavated for foundation, and began building. Substantial work was done on both. Heim testified that Mrs. Saltzman not only encouraged him to build the Sharp and Beyer homes but also encouraged him to take additional deposits on sales. She is said to have instructed him to post a $7,000 cash bond to ensure the construction of street improvements, the cost of which plus the credit owing to him from Woodside Lane would be applied to a down payment. At the end of 1956, Hillbrook Acres ran advertisements in Philadelphia newspapers to further the sale of lots in tract 2.
Heim admitted that he had had a conversation with Funk, his former associate in Hillbrook Acres, during which Funk told him he was "crazy to go and enter into a deal on a *69 piece of ground" which he did not own. Heim denied that the real reason for his proceeding to develop tract 2 was that he was in need of deposit money to complete work on the houses under construction in Woodside Lane.
Nevertheless, in late 1956 it became apparent that Hillbrook Acres was in serious financial difficulties. Of the eight homes in Woodside Lane which were to be built for outside purchasers, Hillbrook Acres was unable to complete three. One disappointed customer brought suit against Heim and Hillbrook Acres for failure to apply moneys advanced to construction of his home. Although there is no evidence as to Mrs. Saltzman's reason for refusing to convey the 50 lots on January 1, 1957, the clear inference from the proofs is that she became disillusioned about Hillbrook Acres' prospects for success. Heim had not successfully completed the development of the eight lots, and the defendants understandably did not want to let him have 50 more on a liberal mortgage plan.
On January 1, 1957 a fire destroyed the Sharp home; it had been 55-60% completed at the time. Insurance policies, which were written through Raymond Saltzman's office (he is an insurance broker as well as an attorney), named Hillbrook Acres as the loss payee thereunder and protected the interest of Maurice Weiner, Mrs. Saltzman's brother and a supplier of materials used in the construction of the Sharp home. All work in tract 2 ceased in February 1957. At the time of the trial below, tract 2 remained as Heim had left it, the Beyer home 25-30% completed.
We pause here to note that, from plaintiffs' evidence, there is no doubt that Mrs. Saltzman was aware of and acquiesced in the beginning of construction of the Sharp and Beyer homes and of the development of tract 2. Construction on both was proceeding while construction in Woodside Lane was still in progress. Both homes were visible from the road leading to Woodside Lane, and Mrs. Saltzman was a frequent visitor to the latter section throughout this period. *70 Moreover, two witnesses testified that they had conversations with Mrs. Saltzman respecting the possible purchase of tract 2 and that she had replied to both that she could not sell to them because of her "deal" with Heim.
In dismissing plaintiffs' complaint at the close of their case, the Chancery Division judge, who elected to view the evidence and inferences therefrom in the light most favorable to plaintiffs (but cf. R.R. 4:42-2(b)), said the following in the course of his oral opinion:
"I cannot have the feeling  and I, frankly, have been looking for it ever since the first day we started  for something of a certain, definite nature to indicate an agreement.
There have been at least five or six different opportunities, when the direct question has been asked of Mr. Heim, `What was the agreement?'
He gives his version of what it was, yes, there is no question about that, but such an agreement is completely and entirely uncertain. It had no definite terms and conditions. It had no definite price, other than the $20 per foot. It had no definite time for performance; * * *.
He said it was for the whole tract. Yet, he comes along and says later it was for 50 lots; and then later comes along with the production of P-15, and says it was for 23 lots.
What was it?
Unless it can be shown to a Court such as this that the parol agreement is definite, concise and without question, there can be no remedy for a parol agreement to convey real estate.
I do not feel that the plaintiffs have sustained the burden of proof.

* * * * * * * *
I cannot believe that any of this indicates, so far as the proofs are concerned, that it was any more than a hope that he was going to be successful in the construction and development of [Woodside Lane], and able to go back to Mrs. Saltzman and say, `I want another 25 lots,' or 50 lots, or 75 lots, or however many he could pay for, or swing, under an agreement."
The trial judge's determination that the terms of the agreement were too uncertain to move a court of equity to order a decree of specific performance must be affirmed. Specific performance will not be decreed unless the existence and terms of the contract be clearly proved, or at least capable of ascertainment with a reasonable degree of certainty. *71 Alnor Construction Co. v. Herchet, 10 N.J. 246, 249, 250 (1952); Potter v. Wolff, 138 N.J. Eq. 114, 115 (Ch. 1946); 5 Williston, Contracts (rev. ed. 1937), § 1424, p. 3986; 1 Corbin, Contracts (1950), § 95, p. 294; Restatement, Contracts § 370, comment b, p. 673. Cf. Cauco v. Galante, 6 N.J. 128, 136 (1951).
In the instant case, all that was certain was that 50 lots were to be conveyed to plaintiffs on January 1, 1957 under a liberal mortgage plan. But the terms of the mortgage, including the amount, amortization payments, and interest rate, were not clearly established; nor is it inferable that the parties ever reached a final agreement in these respects. See McKibbin v. Brown, 14 N.J. Eq. 13 (Ch.), affirmed 15 N.J. Eq. 498 (E. & A. 1861); Moore v. Galupo, 65 N.J. Eq. 194 (Ch. 1903). There is nothing to indicate the kind of deed to be executed and delivered to Heim or his designee. And while the testimony reveals that the down payment might have been waived, the evidence is vague as to its amount. The total price to be paid for the 50 lots was not established with any greater degree of certainty. Although the agreement was based on a price of $20 per frontage foot, the Chancery Division could not calculate the amount, because municipal disapproval of the subdivision plan (under which plaintiffs claim the number of feet can be computed) might result in a realignment of streets and lots. This is precisely what occurred in the Woodside Lane tract. Under the circumstances, we find no satisfactory method of formulating a judgment for specific performance. Compare Fountain v. Fountain, 9 N.J. 558 (1952); Cavanna v. Brooks, 97 N.J. Eq. 329, 334 (E. & A. 1925).
Just as it is clear, however, that the agreement does not lend itself to specific enforcement, it is also clear from plaintiffs' proofs that there was an understanding between the parties that the land should be conveyed on a certain date for a price determinable by a certain formula. Of the various explanations as to the relationship between Heim and Mrs. Saltzman in respect to tract 2, i.e., that he was *72 trespassing thereon to obtain additional deposit money to finance the completion of the Woodside Lane section, that he held an option to purchase on January 1, 1957, that he proceeded to develop it on the mere hope that an agreement could eventually be reached, or that there was indeed an oral understanding that the land would eventually be conveyed, the proofs adduced by plaintiffs abundantly demonstrate that the last hypothesis is the more plausible.
The parties' prior experience with verbal agreements, particularly in relation to the Cuthbert Park development, Hecker's testimony that Mrs. Saltzman said in 1954 she was "backing" Heim in the development of the two tracts, the fact that defendants did not pay Heim the credit he was to receive from the Woodside Lane project, the actual sale, with defendants' apparent acquiescence, of two lots in tract 2, the grading, engineering, excavation, and construction work performed and ordered to be performed by Hillbrook Acres in tract 2, the posting of a municipal completion bond by Hillbrook, its advertising campaign, the writing of fire insurance policies on the Sharp house through defendant's office with Hillbrook Acres and Mrs. Saltzman's brother as loss payees thereunder, the testimony of two ostensibly impartial witnesses to the effect that Mrs. Saltzman refused to negotiate a sale of tract 2 to them  all militate in support of the contention that there existed between the parties a final understanding as to the ultimate transfer of tract 2 to Heim. Moreover, there is the ring of truth in Heim's explanation of the deferral of the closing to January 1, 1957 as caused by defendants' tax posture, as well as in his testimony that Mrs. Saltzman suggested an interim lease to govern Sharp's possession until that date.
While it is therefore clear that the parties thought and acted as if they had a contract, the recipe for the making of a binding contract requires if not absolute definiteness and certainty on essential terms, at least expressions of assent sufficient to permit reasonable implications to be drawn as to the performance to be rendered. Parties are *73 not bound by what they think, but rather by what they say. Savarese v. Pyrene Mfg. Co., 9 N.J. 595, 599 (1952); Friedman v. Tappan Development Corp., 22 N.J. 523, 531 (1956); Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958). On the other hand, where the parties evidently intended to enter into a binding contract or where a substantial performance has already been rendered, courts will strive to attach a definite meaning to otherwise doubtful agreements, and this on the basis that uncertainty should not be allowed to hamper relief further than necessity requires. 1 Williston, Contracts (3d ed. 1957), § 37, p. 111, n. 11. See also 1 Corbin, op. cit., supra, § 95, p. 290. The law is, too, that a lesser degree of certainty will be tolerated in awarding damages for the breach, as distinct from relief by way of specific performance. Alnor Construction Co. v. Herchet, supra, 10 N.J. at page 250; Restatement, Contracts, § 370, comment b, p. 673; Annotation, 65 A.L.R. 7, 102, 106 (1930).
From our review of the record as it now stands, we also hold to the view that the terms of an agreement to convey were not established with sufficient certainty to permit a remedy in damages for its breach. Some of the parties' undertakings are clear enough. Thus, 50 lots were to be conveyed on January 1, 1957. The 50 lots were those nearest the Woodside Lane piece and have been delineated on a map of the two tracts. While the total price is not presently ascertainable, the agreement to pay $20 per frontage foot provides a certain and practicable method of price determination once the necessary plan approvals have been obtained.
Nevertheless, still open for negotiation were the terms of payment, including the principal amount of the mortgage, the due date, the interest rate, and the usual provisions with respect to default in interest and taxes. The uncertainty of plaintiffs' proofs in this regard, standing alone, rendered the contract unenforceable. Nichols v. Williams, 22 N.J. Eq. 63 (Ch. 1871); Potts v. Whitehead, 20 N.J. Eq. *74 55, 60 (Ch. 1869), affirmed 23 N.J. Eq. 512 (E. & A. 1872). Cf. Moore v. Galupo, supra. Although our courts have proved ready to make the reasonable implication that the amount of a mortgage is payable on demand in cases where the terms were unsettled and such was the intention of the parties (Cauco v. Galante, supra, 6 N.J. at pages 134-136; Green v. Richards, 23 N.J. Eq. 32 (Ch.), affirmed sub nom.; Richards v. Green, 23 N.J. Eq. 536 (E. & A. 1872); Luczak v. Mariove, 92 N.J. Eq. 377, 380 (Ch. 1921), affirmed 93 N.J. Eq. 501 (E. & A. 1922)), there is no doubt in the present case but that it was the intention of the parties that time was to be given for payment of the purchase price. Compare Matlack v. Arend, 2 N.J. Super. 319, 328-330 (Ch. Div. 1949), where the plaintiff's proffer of the purchase price in cash was held to remove the indefiniteness.
Notwithstanding the foregoing adverse conclusions on plaintiffs' rights to recover on the express undertaking, there remains for consideration whether a basis for recovery exists upon the pleaded quasi-contract theory of restitution founded upon the inequity that would attend the denial of any return for the time, services, and money already expended in the development of tract 2. On this phase of the case, the trial judge agreed with the proposition of law urged by the defendants on the motion to dismiss that there is no remedy in quasi-contract unless there is either "mutual mistake" or "mistake on the part of one party and fraud on the part of the other."
The proper rule to be employed in these circumstances is as stated in Restatement, Restitution, § 40(c), illustration 7, pp. 155 and 159-60. Where one party, with knowledge that another is under a mistaken belief of ownership, permits him to make improvements upon the former's land without objection after a reasonable opportunity to notify the other of his mistake, his conduct in permitting the continuance of the services subjects him to liability for their value. Cf. Copper v. Wells, 1 N.J. Eq. 10 (Ch. 1830). *75 The rule (which would include one who by mistake considers himself the vendee under a non-existent contract of sale) is an exception to the broad principle that a person who officiously or voluntarily confers a benefit upon another is not entitled to restitution therefor. It is not unlikely that the exception comports with the general common sense feeling of lawyers and laymen alike.
Where the rule is applicable, the plaintiff is at least entitled to what the work performed and services expended are reasonably worth in view of the purposes of the recipient, i.e., to the amount by which the market value of the lands is increased as a result of the improvements. See Restatement, Restitution, § 40, comment f, p. 161, and § 155, pp. 614-15.
The rule just mentioned is not the only basis for a quasi-contractual recovery suggested by the evidence in the present case. If it is determined that the parties did in fact have an intention to be bound by an agreement (as plainly appears to be the case) but that the agreement which they intended is unenforceable for uncertainty in terms (as already concluded), the defendants have a duty to pay for whatever value they have received from plaintiffs' partial performance, regardless of the absence of proof of the defendants' lack of good faith in permitting the services to be rendered. 1 Corbin, op. cit., supra, § 99, p. 314, § 102, pp. 322-23; 1 Williston, op. cit., supra, § 49, p. 158, text at n. 16; Annotation, 92 A.L.R. 1396, 1400-01 (1934); 98 C.J.S. Work and Labor § 30, p. 759.
We therefore hold that the trial judge should not have dismissed the proceeding at the close of the plaintiffs' case but should have called upon the defendants for their affirmative testimony in support of the defense as to the claim for unjust enrichment.
Reversed and remanded for a new trial limited to the issues noted.