Frank LO BOSCO, Plaintiff,

v.

**KURE ENGINEERING LIMITED,
et al., Defendants.**

Civ. A. No. 93–2451.

United States District Court,
D. New Jersey.

July 11, 1995.

Steven M. Kramer, New York City, for plaintiff.

William F. Maderer, James H. Aibel, Michelle Viola, Paul Degiulio, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, for defendants.

## OPINION

WOLIN, District Judge.

This matter is opened before the Court upon the motion of defendants for summary judgment. The motion has been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons given below the motion will be granted with respect to counts four, seven, eight, and nine only, and with respect to punitive damages. The motion will be denied as to the rest of the complaint.

## BACKGROUND

Except as noted below, the facts that constitute the setting of this lawsuit are not disputed. Plaintiff Lo Bosco is an attorney presently employed at a respected law firm in this state. The events that give rise to this action occurred as he began his career.

Upon graduating law school in 1987, plaintiff worked for a time at the accounting firm of Arthur Andersen & Company. There he met defendant, Mayling Woo, daughter of defendant Luther Woo. Luther Woo is the president and chief executive officer of defendant Kure Enterprises, a substantial Japanese corporation that markets industrial and automotive products.

In 1988, plaintiff left Arthur Andersen to take up a judicial clerkship. Upon completion of the clerkship, he secured a position at the Newark law firm of Crummy, Del Deo, Griffinger & Vecchione ("Crummy Del Deo"). He remained at Crummy Del Deo for a short time only, from October of 1989 to January 1990. How he came to leave the firm is central to this lawsuit.

Mayling and plaintiff were dating from the time plaintiff worked at Arthur Andersen. In August of 1989, after he completed his clerkship, the couple travelled to Hawaii. There Mayling introduced Lo Bosco to her father, Luther. Plaintiff testified that Luther and he discussed his career. Lo Bosco Dep. at 118–29. In September of 1989, Mayling returned from Hawaii and told plaintiff that she was going to quit her job at Arthur Andersen to work for her father. During these months, Mayling was actively searching for real estate ventures on her father's behalf. Mayling Dep. at 125, 298. Mayling inquired of plaintiff where she could get information on possible real estate investments in this country for her father to invest in. Id. at 154–55; Lo Bosco Dep. at 151. The social relationship between plaintiff and Mayling continued. Lo Bosco Dep. at 152.

Plaintiff had some involvement with Mayling's prospecting efforts at this time. Plaintiff testifies that he did due diligence on a property called Pheasant Hollow at Mayling's request for Luther. Lo Bosco Dep. at 244–4; Mayling Dep. at 372. Plaintiff's 12G Statement ("Plaintiff's 12G"), Exhibit 63 (interview record of Dai–Ichi Bank). Luther provided plaintiff with real estate text books and covered expenses for plaintiff during this period. Luther Dep. at 79. In the end, plaintiff says he recommended against the investment, Lo Bosco Dep. at 206, 208–09

and Luther did not invest. Luther denies knowing that plaintiff investigated the investment for him. Luther Dep. at 67.

In late 1989, plaintiff claims, Luther and Mayling began to solicit him to leave Crummy Del Deo and work for Luther on a full time basis. The evidence of this solicitation will be discussed more fully below. It suffices to say here that defendants dispute this version of events. Plaintiff alleges that Luther was favorably impressed with the work he did on the Pheasant Hollow prospect, and that Luther recognized that he needed plaintiff's expertise to invest in the United States.

Plaintiff maintains that he was hesitant to fall in with this plan. Lo Bosco Cert. ¶ 12; Mayling Dep. at 296–97. Plaintiff was allegedly worried about giving up his prestigious legal position for the uncertainty of a career of investing with the Woo family. Therefore, he claims, he negotiated an arrangement with Luther and Mayling in which he would have discretion over which company to buy, and he would receive a 50% equity share in any company acquired. In return, plaintiff would quit his job at Crummy Del Deo and devote his energies to searching for a company in which to invest. After the acquisition, plaintiff was to run the business and be compensated at a rate equivalent to his salary at the law firm. Plaintiff's Brief at 6–7; Complaint ¶ 47. Plaintiff maintains that he asked for the agreement in writing, but was told by Mayling that this would not comport with the Japanese way of doing business and that the request would be taken as an insult to Luther's honor. Complaint ¶ 50.

In any event, in January of 1990, plaintiff resigned from Crummy Del Deo. Plaintiff testifies as to numerous business opportunities he investigated. By August of 1990, plaintiff had identified a company called National Bottlers that made specialty soft drinks. The purchase price was $700,000. Luther was made aware of the business. It was at this time, on August 26, 1990, that Mayling and plaintiff were married.

To plaintiff's dismay, Luther refused to provide the money to purchase National Bottling. Plaintiff alleges that this was in breach of an enforceable agreement he had with Luther and Mayling and it is the grava-men of this action. In June of 1991, plaintiff and Mayling separated, and they were divorced by an Illinois court in 1992. Plaintiff successfully contended that the court lacked jurisdiction over him, so the divorce was entered in default. This action was filed the following year.

## DISCUSSION

### 1. The Summary Judgment Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. dismissed, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. Id. Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When, as here, the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. "The mere existence of a scintilla of evidence will be insufficient." *Id.* at 252, 106 S.Ct. at 2512. The inquiry is whether, "seen through the prism of the substantive evidentiary burden," a reasonable jury could render a verdict for the burdened non-movant. *Id.* at 254–55, 106 S.Ct. at 2513–14. Thus, in this case, plaintiff must make a showing sufficient for a reasonable jury to find that he is entitled to a verdict by a preponderance of the evidence. *Id.* at 252, 106 S.Ct. at 2512.

The non-movant may not "rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *see* Fed.R.Civ.P. 56(e). The "unsupported statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

## 2. The Contract Theories

In the complaint, plaintiff bases his claim on the theory that there was a contract between himself and the defendants. Kure's refusal to fund the purchase of National Bottlers is alleged to be a breach of this contract. Defendants attack on this allegation relies on the argument that the terms of this alleged contract are too vague and indefinite to be enforceable.

A contract is unenforceable for vagueness when its terms are too indefinite to allow a court to ascertain with reasonable certainty what each party has promised to do. *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992). The New Jersey courts focus on the performance promised in testing an agreement for vagueness. *See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank,* 163 N.J.Super. 463, 474, 395 A.2d 222 (App. Div.1978) ("An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one.") (citing *Friedman v. Tappan Dev. Corp.,* 22 N.J. 523, 531, 126 A.2d 646 (1956)), *certif. denied,* 79 N.J. 488, 401 A.2d 243 (1979). This does not mean that each term must be exactly spelled out. Where the court can determine the contract's "essential terms" to which the parties manifested an intent to be bound, the contract is enforceable. *Ryan,* 128 N.J. at 435, 608 A.2d 280. The Court notes by analogy New Jersey law providing that a contract for the sale of goods will not fail if the parties intended to agree and there is a "reasonably certain basis" for crafting a remedy even though some terms are left open. N.J.S.A. 12A:2–204; *Truex v. Ocean Dodge, Inc.,* 219 N.J.Super. 44, 50, 529 A.2d 1017 (App.Div.1987).[1]

---

1. N.J.S.A. 12A:2–204 and *Truex* look to remedy rather than performance in analyzing contractual indefiniteness. The Court does not believe, however, that this derogates from the general performance-based approach discussed above. Whether the analysis begins with performance or

The law generally and in New Jersey does not favor voiding a contract for vagueness. *See* E. Allen Farnsworth, *Contracts* § 3.27 at 208–09 (2d ed. 1990); *Paley v. Barton Savs. & Loan Ass'n,* 82 N.J.Super. 75, 83, 196 A.2d 682 (App.Div.), *certif. denied,* 41 N.J. 602, 198 A.2d 446 (1964). The courts will not scruple at filling gaps or interpreting ambiguous terms where there is evidence of a manifestation of assent to enter into a bargain. *See Paley,* 82 N.J.Super. at 83, 196 A.2d 682; *Heim v. Shore,* 56 N.J.Super. 62, 73, 151 A.2d 556 (App.Div.1959); 4 Samuel Williston, *Williston on Contracts,* § 4:18 at 421–22 (4th ed. 1990). Thus, a promise to provide "the usual sponsorship fees" for a bowling team was sufficient. *Leitner v. Braen,* 51 N.J.Super. 31, 39–40, 143 A.2d 256 (App.Div.1958). Likewise, an agreement by a savings and loan association to hold $100,-000 available to buy mortgages that a real estate developer hoped to obtain from the future buyers of unbuilt houses was sufficiently definite. *Paley,* 82 N.J.Super. at 82–84, 196 A.2d 682.

A contract may be sufficiently certain even though one party has discretion to choose between material terms. *Kleckner v. Mutual Life Ins. Co.,* 822 F.2d 1316, 1319 (3d Cir.1987). Partial performance by one side of the bargain may, by the specifics of that performance, cure an indefinite term of the agreement. *Merrick v. United States,* 846 F.2d 725, 726 (Fed.Cir.1988); *Restatement (Second) of Contracts,* § 34(2) (1979); Joseph M. Perillo, *Corbin on Contracts,* § 4.7 at 606–08 & n. 2 (rev. ed. 1993). Likewise, even if uncertainty remains, where one party has acted in reliance on an indefinite agreement the courts will act to protect that reliance whether through a contractual or non-contractual remedy.[2] *Restatement, supra* § 34(3); *see also Heim,* 56 N.J.Super. at 73, 151 A.2d 556.

With regard to contracts for services in return for a percentage of some yet-to-be-determined number, such as profits, sales, etc., the courts look to whether there are certain dates of commencement and termination. *See Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 86–87 (3d Cir.), *certif. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). As with any problem of ambiguity in a contract, the court may look to extrinsic circumstances to determine the dates of termination. *Id.* at 87. Of course, the variable to which the percentage rate is applied need not be determined at the time of contracting for the contract to be enforceable.

In this case, defendants argue that there is no genuine issue as to several facts that show the contract should be overturned for vagueness. They argue that there is no specificity as to the amount of financing Kure was obligated to provide. Defendants claim that there was no agreement as to the percentage of ownership in the acquired enterprise to which plaintiff would be entitled, or whether this ownership share was to be subject to the financing. Defendants argue that there was no termination date to the contract, no limit to the number of businesses Lo Bosco could demand that Kure purchase, and no bounds on the discretion with which plaintiff was invested in choosing the companies to be purchased.

The count of the complaint alleging breach of contract does not disclose what type of contract is thought to have been breached in this case. Defendants, in their moving papers, have cast it in terms of an employment contract. Plaintiff, in opposition, calls it a joint venture. It is alleged that plaintiff, Mayling, Luther and Kure were joint venturers in the search and planned acquisition of companies.

A joint venture is predicated on the same legal event as an employment, partnership, contract or other relationship: an agreement between the parties. *Sullivan v. Jefferson, Jefferson & Vaida,* 167 N.J.Super. 282, 289, 400 A.2d 836 (App.Div.1979); *Wittner v. Metzger,* 72 N.J.Super. 438, 443, 178 A.2d 671 (App.Div.), *certif. denied,* 37 N.J. 228, 181 A.2d 12 (1962). However, the joint venture relationship may be less formal.

---

remedy will not be critical in most cases, as they will be two sides of the same coin.

**2.** The Court notes that at some point this theory will merge with that of promissory estoppel, discussed *infra.*

*Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co.,* 611 F.Supp. 665, 679 (D.N.J.1985). It may be implied wholly or in part from the acts and conduct of the parties. *Id.* Where there is an explicit agreement, it "need contain no particular form of expression, nor is formality of execution necessary." *Wittner,* 72 N.J.Super. at 444, 178 A.2d 671.

■ A joint venture agreement will contain some or all of the following elements:

(A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

(B) A joint property interest in the subject matter of the venture;

(C) A right of mutual control or management of the enterprise;

(D) Expectation of profit, or the presence of 'adventure,' as it is sometimes called;

(E) A right to participate in the profits;

(F) Most usually, limitation of the objective to a single undertaking or Ad hoc enterprise.

*Id.* (quoting Williston, *supra* § 318A, at pp. 563–65). The agreement, whether implied, explicit, or a combination of the two, will be interpreted and its validity tested under the normal rules of contract construction. *Id.*

In the case at bar, plaintiff alleges that the terms of this joint venture were that 1) he would resign from Crummy Del Deo, and devote his energies to seeking and evaluating companies for purchase, 2) that Luther would provide $10,000 to defray expenses during the search process, 3) that plaintiff would have discretion to decide which company the venture would acquire up to $1,000,000 in value, 4) that for any company purchased up to the value of $1,000,000, plaintiff would be given a 50% ownership share in that company, 5) for businesses worth more than $1,000,000 plaintiff did not have sole discretion as to the purchase decision, apparently a consensus of the venturers was needed, plaintiff was to receive an ownership share worth $500,000, and defendants were responsible for arranging financing, and finally 6) after purchase of the business, plaintiff was to receive a salary comparable to his Crummy Del Deo salary of approximately $60,000

per year to manage the business to be paid out of the operating revenue of the acquired company. Plaintiff's Brief at 6–7; Complaint ¶ 47.

■ The Court finds that a joint venture agreement on the terms listed above would be sufficiently definite to be enforced. Assuming for the moment that the plaintiff's allegations of the terms are true, it is obvious that many details were left to be negotiated once a target company was found. Nonetheless, the basic outline of each party's duties is clear. Plaintiff was to find and purchase a business, and receive one-half of its value; Luther was to provide the funds and receive the other half of the business. The fact of this law suit is evidence of the unwisdom of intra-family business arrangements involving significant sums being conducted on such general terms without the benefit of a written understanding. That does not prevent the Court from determining whether there has been a breach of the alleged agreement or from fashioning a remedy.

■ Defendants correctly argue that the terms concerning the parties' duties and plaintiff's share in the event of the purchase of a company worth more than $1,000,000 are too vague to enforce. This is because the terms do not specify what defendants would actually be required to do if plaintiff had recommended the purchase of such a company. However, this aspect of the agreement is not relevant because National Bottling was only worth $700,000. Thus, this clearly vague portion of the agreement was never brought into play. The Court need not extend the contractual vagueness analysis to the hypothetical boundaries of the supposed contract. Only those provisions that are implicated by the parties' actions under them and material to their changes in position need be considered.

■ Defendants make the same argument as to the terms of plaintiff's post-acquisition employment with the acquired company, because there is no allegation as to how long plaintiff would be guaranteed a position. The argument is more to the point because it concerns defendants' duty to plaintiff as the venture was actually unfolding. It does not,

however, win the day for defendants for two reasons.

First, the Court finds that there were two phases to the alleged agreement. In the first phase, plaintiff acted to his detriment by leaving his job and doing the work of looking for an appropriate investment. This phase was to be consummated by the purchase of the business and the 50/50 split of the equity in it between the parties. Phase two began with plaintiff's employment managing the company in return for a salary.

The Court agrees with the defendants that an agreement to employ a person with no term to the agreement creates, at best, an at-will employment contract. As such it would unenforceable either for vagueness, or due to the right of the employer to terminate at-will. Here plaintiff does not allege, and has produced no evidence to show, that there was a term to the employment he was to have in the jointly held company.

Nonetheless, the first phase of the agreement appears to be sufficiently specific to determine the obligations of both sides. Plaintiff was to supply effort and expertise, and defendants were to supply money. Both were to share in ownership of the acquired company and its profits. This qualifies easily as a joint venture as it is defined in the authorities cited above. Indefiniteness as to the company to be acquired was cured when plaintiff identified one that fell within the price range specified and that, as the Court must infer on this motion, was a reasonable target for acquisition.

Secondly, examining the post-acquisition employment arrangement more closely, it is not as illusory as it appears at first blush. The courts are willing to look at the circumstances of contracting to fill gaps in an agreement that would otherwise be too vague. *Dennis v. Thermoid Co.*, 128 N.J.L. 303, 25 A.2d 886 (E. & A.1942); 4 Williston, *supra*, § 4:19 at 429. In this case the Court notes that plaintiff's supposedly at-will employment was to be with a company in which he held a 50% interest. Thus, plaintiff may be able to show that he would have been in a position to have considerable job security.

Most persuasive, however, is the fact that a minimum term may be implied from the circumstances of the contracting. Plaintiff claims that his motivation in securing the promise of equity, discretion in the acquisition, and the post-acquisition employment was to protect his reliance interest in leaving his job at Crummy Del Deo. He claims that he told Luther and Mayling that this was his concern. Since his relationship with Luther and Mayling, plaintiff has managed to mitigate his damages by securing a position with another firm. The term to be implied, then, would be the value of his Crummy Del Deo salary from the time he resigned until the time he secured the comparable position.

The Court notes that this result is easily supportable under two different theories. On the one hand, it would comport with the practice of courts, discussed above, that cure otherwise vague contracts by protecting a party's reliance interest. On the other hand, it would also be consistent with New Jersey's law of an implied term of good faith in contracts. *Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 182, 425 A.2d 1057 (1981); *New Jersey Bank v. Palladino*, 77 N.J. 33, 46, 389 A.2d 454 (1978); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129–30, 351 A.2d 349 (1976). Like the law which mitigates the requirement of definiteness, these cases are based on the policy of giving a contract legal effect where the parties have evidenced an intent to be bound, *Palladino*, 77 N.J. at 46, 389 A.2d 454, or protecting a reliance interest against a promisor's opportunism. *Bak–A–Lum*, 69 N.J. at 130, 351 A.2d 349. Accordingly, the implied term works to prevent one party from depriving the other of the benefit of his bargain. Implying a term of employment that would produce an income equal to the salary lost would restore the benefit for which plaintiff bargained; security from the risk in dealing with Luther and Mayling Woo.

Upon review of the record, the Court finds that there is sufficient evidence to raise a genuine issue of fact as to enough of the terms alleged by plaintiff to permit a jury to find that a joint venture existed. Much of the evidence is in the form of plaintiff's own

testimony. Lo Bosco avers that Luther Woo, in conversations with him, promised to provide up to $1,000,000 in cash to purchase a business, and that he, Lo Bosco, would receive 50% equity in that business. Lo Bosco Dep. at 265. Lo Bosco testified that he received a $10,000 check from Luther, via Mayling, to defray expenses while he prospected for a business to buy, Lo Bosco Dep. at 334, and a copy of the check appears in the record. Plaintiff's 12G, Exhibit 119.

Because most of the negotiations with plaintiff were conducted by Mayling, much will depend on plaintiff's showing as to whether Mayling was truly an agent of her father, Kure or both. Plaintiff has submitted numerous examples of Mayling holding herself out as Luther's agent. *E.g.*, Mayling Dep. at 169–70, 320. Luther has testified that Mayling represented Kure. Luther Dep. at 88. As the record stands now, a reasonable jury could find that Mayling had either actual or apparent authority to bind Luther, Kure, or both, as well as herself as a principal.

There is some testimony of third parties that corroborates the existence of an agreement. Plaintiff's mother, Rose Lo Bosco, testified to an admission of Mayling that evidences the existence of some kind of agreement. Rose Lo Bosco Dep. at 22–23. Plaintiff claims he consulted an attorney, John Catherall, for advice in structuring his business relationship with Luther and Mayling. Catherall has testified to a number of admissions by defendants, including an occasion where Luther referred to Lo Bosco as his partner, Catherall Dep. at 125, 127, and where Mayling stated that she and Lo Bosco were working together in her father's interest. *Id.* at 83, 116. Catherall testifies that Mayling telephoned him and said that they had worked out an agreement with her father to purchase a business jointly, and to thank him for his help in advising plaintiff. *Id.* at 84. He also testifies that Mayling told him that she and plaintiff would travel to California in 1990 to purchase a bottling company. Catherall Cert. ¶ 21.

Catherall's testimony as to his communications with plaintiff are admissible, but only to the extent that they fall within the exception to the hearsay rule for statements concerning present state of mind, or the *Hillmon* doctrine. *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (statement of intent to do an act in future admissible to show declarant did the act). Catherall testified that plaintiff approached him in late 1989 and said that he had been offered a job as an employee of the Kure Corporation. Catherall Dep. at 31. Numerous conversations followed in which, Catherall avers, plaintiff voiced his concern about leaving his position at Crummy Del Deo for an at-will situation with Luther Woo. *Id.* at 59. Catherall testifies that he and Lo Bosco discussed structuring the relationship as a co-venture agreement, *id.* at 102–05, with the cash for acquisitions to be provided by Luther, *id.* at 52, and the decision on what business to purchase to be left to plaintiff. *Id.* at 111. Catherall also testified as to the equity plaintiff was to have in the acquired business. *Id.* at 73, 78, 96. Finally, plaintiff told Catherall that Luther had agreed to these terms. *Id.* at 69.

This testimony is relevant only because it is evidence of the state of mind on one side of the transaction at the time of the alleged contracting. Thus, it will support the elements of reliance and the definiteness of the terms of the agreement on plaintiff's side of the equation. The Catherall testimony does not, however, show what the defendants actually agreed to, and the Court will not consider it as evidence on that issue now or at the time of trial. However, for the limited purposes mentioned, the Court finds that the Catherall testimony properly supports plaintiff's opposition to this motion.

Other of the proffered third party testimony is not as helpful. The testimony of a Mr. Bodrato is submitted, but it is impossible to tell what the basis of his knowledge is.

The obvious question, and one that defendants have not neglected to ask, is why plaintiff did not insist on reducing their arrangement to writing. Plaintiff has an answer: he claims that when he proposed a written agreement, he was told that it would offend Luther as being in violation of Japanese business customs. Again he offers his own testimony as to the admissions of Mayling. Lo

Bosco Dep. at 365. There is also evidence that another son-in-law had been refused a written memorial of a loan he had received from Luther concerning a house he had purchased. Mayling Dep. at 80–83. The refusal of the son-in-law is admissible either as evidence of habit, under Federal Rule of Evidence 406, or as direct evidence of Luther's belief that written agreements were not an honorable way to do business. Fed.R.Evid. 404(b).

In any event, there is no dispute that plaintiff did resign from the Crummy Del Deo firm and devote his energies to looking for suitable businesses in which to invest Luther's money. Plaintiff has submitted documentary evidence of his efforts searching for companies. The record contains evidence that plaintiff discovered the National Bottling Company and proposed it to Luther. These submissions constitute evidence that there was an agreement to search for possible investments. There is no dispute that Luther refused to purchase National Bottling and that whatever relationship there had been between the parties was effectively dead.

■ Defendants have made much over what they assert is the commercial unreasonableness of the arrangement alleged by plaintiff. The Court is unconvinced. It is hornbook law that a contract need not involve an equivalence of exchange to be enforceable. In the circumstances, a jury might reasonably believe that a father would be willing to enter into a rather one-sided deal with his prospective son-in-law, particularly where the son-in-law had already demonstrated some basic business sense in a prior transaction. The case books are littered with family ventures gone sour. As the proverbial Uncle Storey discovered when dealing with a family member, reliance considerably more ethereal than quitting a job at a law firm will support a promise to pay money. *Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256 (1891) (nephew's promise not to smoke, swear, or play at cards or billiards until age 21 sufficient consideration for promise to pay $5,000).

Upon the record as it stands now, the Court is satisfied that a reasonable jury could find that there was a joint venture agreement here. Obviously much would depend on the credibility afforded to the testimony of plaintiff. The Court cannot find as a matter of law, however, that the sworn testimony of an interested party is incapable of raising an issue of fact. A jury might well discount such testimony of an oral agreement where so much is left open and such large sums are at stake. On the other hand, plaintiff has some evidence to corroborate his story as to why there is no written agreement, and why, as a result, he must rely so heavily on his own word. The law is clear that it is not for the Court to make such credibility determinations on a motion for summary judgment.

Accordingly, the motion will be denied on the count alleging breach of contract. The Court has not been asked to rule, and does not express an opinion, on whether the full panoply of contractual remedies may be available here, or only an award based on reliance. The holding here is only that summary judgment may not be granted on this record as to the count alleging breach of contract.

### 3. Promissory Estoppel

In the alternative to his joint venture theory, plaintiff claims that defendants are estopped from denying the existence of an agreement between them under the theory of promissory estoppel. Under promissory estoppel, plaintiff maintains that defendants made certain promises to him that foreseeably would lead and did lead him to act to his detriment. Here the detriment was in resigning from Crummy Del Deo and expending time and energy prospecting for investments.

■ In New Jersey, promissory estoppel requires, *inter alia*, proof of a "clear and definite promise by the promisor" and detriment on the part of the promisee of a "definite and substantial nature." *Malaker*, 163 N.J.Super. at 479, 395 A.2d 222. The discussion above as to the evidence in the record concerning the promise by defendants shows that summary judgment may not be granted on that element. Whether there is sufficient

reliance on the part of plaintiff to support his claim under this theory has not yet been addressed.

■ Defendants argue that plaintiff's resignation from his law firm is insufficient because his employment there was at-will and because quitting was the surrender of an illusory right. While the Court has not discovered any New Jersey authority on the question of whether surrendering an at-will employment will constitute valid consideration, or reliance under a promissory estoppel theory, it believes that this question should be answered in the affirmative, and that defendants' argument must fail. There is ample case law for the proposition that a promise of at-will employment will be sufficiently definite to constitute reliance under promissory estoppel theory where the promisee has acted to his detriment in taking up the employment. *Bower v. AT & T Technologies, Inc.,* 852 F.2d 361, 365–66 (8th Cir. 1988); *Goodman v. Dicker,* 169 F.2d 684 (D.C.Cir.1948) (at-will franchise); *Hunter v. Hayes,* 533 P.2d 952 (Col.Ct.App.1975).

If the promise of an at-will employment contract will be sufficiently definite to support a cause of action for promissory estoppel, then the Court believes that the inverse should be true as well; relinquishing at-will employment should be a sufficiently definite reliance to support the same cause of action. *See Ricketts v. Scothorn,* 57 Neb. 51, 77 N.W. 365 (1898). Notwithstanding the fact that an at-will employment relationship is a wholly executory contract, the employer and employee enjoy the right of continuing in the relationship until one of them terminates it. Defendants have not argued that plaintiffs employer would have terminated him, or that he was in anything but good standing with the law firm. Instead, defendants allegedly induced plaintiff to terminate. Plaintiff had the opportunity to continue at Crummy Del Deo as long as he was able to please the firm with his work. Defendants' promise caused him to relinquish that opportunity.

The Court finds that, on the record before it, plaintiff's resignation from his law firm was the relinquishment of a sufficiently substantial and definite right to support a cause of action for promissory estoppel. Moreover, the time and energy spent looking for companies to buy stands unrebutted as an element of plaintiff's reliance on defendants' promises. Accordingly, summary judgment will be denied on this count.

**4. Equitable Estoppel, Misrepresentation and Fraud**

Several counts of the complaint state causes of action that have a misstatement of presently existing fact as an element. These include counts alleging equitable estoppel, fraudulent misrepresentation, negligent misrepresentation and conspiracy to defraud.

Defendant's attack on these counts rely on the rule that a promise or statement of fact *in futuro* will not support these types of allegations. The indispensable element is that the statement be a misrepresentation of a fact as it existed at the time of the misrepresentation or at some time prior to the misrepresentation. *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 51–52, 477 A.2d 1224 (1984) (fraud); *Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 N.J. 334, 339, 403 A.2d 880 (1979) (equitable estoppel); *Stochastic Decisions, Inc. v. DiDomenico,* 236 N.J.Super. 388, 395, 565 A.2d 1133 (App.Div.1989) (fraud), *certif. denied,* 121 N.J. 607, 583 A.2d 309 (1990). Accordingly, a promise to do something in the future will not normally suffice. *Anderson v. Modica,* 4 N.J. 383, 391–92, 73 A.2d 49 (1950).

■ Defendants concede however, that where a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud, etc. *Phoenix Technologies, Inc. v. TRW, Inc.,* 834 F.Supp. 148, 152 (E.D.Pa.1993) (New Jersey law); *Notch View Assocs. v. Smith,* 260 N.J.Super. 190, 202–03, 615 A.2d 676 (Law Div.1992). A showing of simple non-performance of the promise will not satisfy plaintiff's burden to show that the promise was fraudulent when made. *Mallon v. Prudential Property & Cas. Ins. Co.,* 688 F.Supp. 997, 1008–09 (D.N.J.1988); *Notch View,* 260 N.J.Super. at 203, 615 A.2d 676.

██ Plaintiff offers evidence of admissions of the defendants on this issue. In Luther Woo's deposition, he had the following exchange with plaintiff's counsel:

Q: So Luther Woo never really had any intent, any serious intent, ever about investing or buying companies in the United States, is that correct?

Defendants' Counsel: Objection

A: Personally you mean? [3]

Q: Yes.

A: Correct.

Q: And you are positive about that?

A: Yes.

Q: Did Kure ever have any serious intention in 1989, 1990, and 1991 of investing or buying companies in the United States?

Defendants' Counsel: Objection, are you talking about—

Q: I don't want—

A: Never seriously.

Q: And you are positive about that?

A: Yes.

Luther Woo Dep. at 85–86. Here defendant admits, under oath, that at no time did he intend to do what it is alleged that he promised that he would do. If plaintiff succeeds in convincing a jury, *inter alia,* that Luther did indeed promise to provide funds to purchase a business, then there is sufficient evidence in the record for that jury to conclude that Luther's promise was fraudulent when made. For this reason, the motion for summary judgment on these counts must be denied.

██ Defendants maintain that here the misrepresentations complained of are identical to the terms of the contract, and that, as a matter of law, a fraud claim may not be maintained. The law is not a model of clarity in this area. *Vanguard Telecommunications, Inc. v. Southern New England Tel. Co.,* 900 F.2d 645 (3d Cir.1990). This Court held in *Werner & Pfleiderer Corp. v. Gary Chem. Corp.,* 697 F.Supp. 808, 815 (D.N.J.

1988), that, where damages for fraud would replicate remedies for which the parties to a contract had bargained in the event of breach, a fraud claim may not be maintained. Judge Fisher, in *First Valley Leasing, Inc. v. Goushy,* 795 F.Supp. 693, 700 (D.N.J.1992), distinguished *Werner & Pfleiderer,* holding that it dealt with a "classic breach of contract case." The court also noted that *Werner & Pfleiderer* and the cases it relied on dealt with sales transactions between commercial entities. *Id.* *First Valley* looked to whether the dispute was "essentially contractual in nature," *id.* (citing *Werner & Pfleiderer,* 697 F.Supp. at 815), or whether it also contained an element that sounded primarily in fraud. *Id.*

Judge Fisher's opinion is a helpful advance of the law in this area, because it reaffirms the conceptual distinction between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised. Since *Werner & Pfleiderer,* the New Jersey Supreme Court has upheld the Appellate Division recognizing a fraud claim between contracting parties. *Perth Amboy Iron Works v. American Home Assurance Co.,* 226 N.J.Super. 200, 216–18, 543 A.2d 1020 (App.Div.1988), *aff'd,* 118 N.J. 249, 571 A.2d 294 (1990) (affirming "substantially for the reasons expressed in the opinion of the Appellate Division"). *First Valley* followed *Perth Amboy* in allowing the fraud claim to co-exist with the contract-based cause of action.[4] The cases cited by defendants do not negate the distinction between fraudulent inducement extraneous to the contract and fraud in its subsequent performance. *E.g., Werner & Pfleiderer,* 697 F.Supp. at 815; *Foodtown v. Sigma Marketing Sys., Inc.,* 518 F.Supp. 485, 489 (D.N.J. 1980). To the extent that its holding in *Werner & Pfleiderer* may be read to the contrary, this Court believes it no longer represents an accurate prediction of how the

---

3. The examination immediately preceding had focused on the distinction between the undertakings of Luther and his company, Kure.

4. Defendants suggest that this line of authority holds that, where fraud may be asserted in a

contractual relationship, it is to the exclusion of the contract claim. Defendants' Reply at 13 n. 21. This reading overlooks the results in *First Valley* and *Perth Amboy.*

New Jersey Supreme Court would rule on this issue. *See also Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1186 (3d Cir.1993); *Labus v. Navistar Int'l Transportation Corp.,* 740 F.Supp. 1053, 1065–66 (D.N.J. 1990) (misrepresentation claim not subsumed under implied employment contract claim under New Jersey law).

Of course, determining whether a situation is "essentially contractual" where the legal elements of fraud also exist will not always be straightforward. On balance, however, the Court finds that the situation presented here is such that an allegation of fraud may be maintained alongside the contract claim. The parties did not bargain for any specific remedy in case defendants refused to go forward with the purchase of a company. Unlike *Werner & Pfleiderer,* this is not a claim by a commercial buyer; rather, the disappointed promisee is an individual who alleges he was lied to by other individuals proposing a joint venture. The Court has found that it remains to be litigated whether the representations of intent to enter into an agreement were actually made. The testimony quoted above is evidence that, if such representations were made, they were a knowing and intentional falsehood.

Defendants question whether plaintiff reasonably and detrimentally relied on the allegedly false representations. The sufficiency of the reliance has already been discussed in connection with promissory estoppel. Defendants also argue that, as a sophisticated attorney, it was unreasonable for plaintiff to rely on an unwritten promise given "the uncertainties inherent in his personal and 'business' relationships with the defendants." Defendants' Brief at 38. Of course plaintiff claims that it was in an attempt to remove some of the uncertainty in the proposed venture that he exacted the promises now alleged to have been broken. Furthermore, defendants' argument as to plaintiff's sophistication is undermined by the fact that, elsewhere in their submissions, defendants claim that plaintiff's inexperience shows that the alleged agreement was commercially unreasonable. Defendants' Reply Brief at 4–5 & n. 9. For these reasons the Court will reject defendants' arguments as to reliance.

Of course, in light of the Court's ruling below disallowing punitive damages in this case, it may be that prevailing on the fraud count will not provide any greater relief than the breach of contract claim. Thus, the question of their distinctness may turn out to be moot. Certainly the Court will not permit a double recovery on these facts. Nonetheless, at this stage of the litigation, the Court finds that the counts based on tortious misrepresentations of fact state a valid alternative theory of relief.

## 5. Breach of Fiduciary Duty

Plaintiff has claimed damages for breach of fiduciary duty. This allegation clearly depends on plaintiff successfully making his case to a jury on the existence of a joint venture.

There can be no question that joint venturers owe each other a fiduciary duty. "The relation of joint adventurers ... is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits." *Bowne v. Windsor,* 106 N.J.Eq. 415, 416, 151 A. 124 (Ch.Div.1930), *aff'd,* 108 N.J.Eq. 274, 154 A. 768 (E. & A.1931). Although the Court has found no authority so limiting the concept, the cases applying this doctrine all concern one joint venturer profiting at the other's expense. *See, e.g., Silverstein v. Last,* 156 N.J.Super. 145, 383 A.2d 718 (App.Div.1978). Thus, upon dissolution, the fiduciary duty will not extend to prevent each venturer from taking positions adversarial to the other. *Fravega v. Security Savs. & Loan Ass'n,* 192 N.J.Super. 213, 223, 469 A.2d 531 (Ch. Div. 1983). Moreover, as befits an equitable doctrine, it must be applied with some flexibility and an eye to the facts presented.

Here, there appears to be no showing that defendants attempted to benefit at plaintiff's expense. Rather than attempt to divert the opportunities or earnings of the venture to themselves, it is alleged that they simply terminated it. As a result, the typical remedy for a breach of fiduciary duty, a constructive trust of the illegitimately acquired profits, is not possible here. Plaintiff's reliance interest will be amply protected

if he prevails on the theories discussed above. Therefore, the Court finds that, even if plaintiff establishes the existence of a joint venture, the equities of the situation would not warrant an award under a breach of fiduciary duty theory. Accordingly, summary judgment will be granted on this count.

## 6. Other Claims

■ The Court will grant summary judgement on the count of the complaint alleging malicious interference with contract. The Court finds that the facts alleged by plaintiff fail to support the elements of this common-law tort. To maintain this allegation, plaintiff must show that the defendant caused a third party to breach a contract with him. *Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 180–81, 72 A.2d 197 (1950). Where, as here, the plaintiff is the one induced to breach the contract, the tort of malicious interference is inapposite. Plaintiff misstates defendants' argument in his rebuttal to the effect that they erroneously claim that an employee cannot maintain an action for malicious interference.

■ Plaintiff has alleged the tort of negligent hiring against defendants Luther Woo and Kure based on the alleged misrepresentations of Mayling. This claim will be dismissed as well. Negligent hiring requires proof, first, that the employee committed an intentional tort that was the proximate cause of plaintiff's injuries and, second, that the employer knew or should have known of a propensity on the part of the employee to engage in the injurious conduct. *Di Cosala v. Kay,* 91 N.J. 159, 173, 450 A.2d 508 (1982). The foreseeability of the employee's wrongful act, or the employer's knowledge of the employee's propensity to so act is a key element. *Johnson v. Usdin Louis Co.,* 248 N.J.Super. 525, 529, 591 A.2d 959 (App.Div.), *certif. denied,* 126 N.J. 386, 599 A.2d 163 (1991).

In this case, plaintiff has not come forward with evidence that defendants had any foreknowledge of Mayling's alleged propensity to commit fraud, or that the allegedly fraudulent acts were foreseeable. Luther's deposition transcript shows a regrettable lack of concern for the possibility that an employee might lie to third parties. Luther Dep. at 20, 22–23. These post-hoc, hypothetical ruminations do not, however, constitute evidence of knowledge or foreseeability. Therefore this count of the complaint will be dismissed.

■ Other claims may be disposed of even more quickly. The claim for unjust enrichment fails because there is no showing that the defendants were enriched by plaintiff's actions. As to those services that plaintiff performed prior to the formation of the alleged contract, there is no evidence that plaintiff performed them with expectation of payment. Plaintiff has also failed to produce sufficient evidence to survive summary judgment on his third-party beneficiary theory. The record would not permit a reasonable jury to conclude that plaintiff was the intended beneficiary of a contract between the defendants. As to the allegation of civil conspiracy, defendants' motion relies on the proposition that the underlying fraud count must be dismissed. As the substantive count will not be dismissed, the motion will be denied. The Court expresses no view as to the ultimate viability of this allegation.

## 7. Punitive Damages

■ Defendants move for summary judgment on the issue of punitive damages. This motion will be granted. Punitive damages are not available in a breach of contract action. The Court has already dispensed with the count alleging a breach of fiduciary duty. The only tort-based theories of recovery that remain in the case are the counts alleging negligent misrepresentation and fraud. Defendants correctly argue that an award of punitive damages requires a showing of culpability in excess of that needed to state the bare bones elements of the underlying tort. W. Page Keeton, *et al., Prosser and Keaton on Torts* § 2 at 9 (5th ed. 1984). Fraud, standing alone, without some additional aggravating element, will not sustain a claim for punitive damages. *Jugan v. Friedman,* 275 N.J.Super. 556, 572, 646 A.2d 1112 (App.Div.), *certif. denied,* 138 N.J. 271, 649 A.2d 1291 (1994).

There has been no such showing in this case. Plaintiff argues that the finding as to aggravating circumstances that would permit

a punitive award is the province of the finder of fact. Plaintiff overlooks the purpose of the summary judgment device, which is to remove issues from the fact finder's consideration where the record will only provide reasonable support for one side. Here, in opposition to a properly supported motion for summary judgment, plaintiff has provided no evidence of heightened culpability, malice or outrageous conduct that would support his allegation.

Finally, the Court will not allow the ill-feeling that apparently infused the divorce proceeding to color this action. The events at issue here all took place before Mayling's and Lo Bosco's marriage fell apart. There is no evidence before the Court that the acts leading to the divorce contributed to the instant dispute, nor does the subsequent failure of the marriage supply that evidence.

## CONCLUSION

For the reasons discussed above, defendants motion for summary judgment will be granted as to the counts of the complaint alleging breach of a third-party beneficiary contract (count 4), tortious interference with contract (count 7), unjust enrichment (count 8), and negligent hiring (count 9). The Court will also grant summary judgment to defendants on the issue of punitive damages, and finds as a matter of law that punitive damages may not be awarded in this case. The motion will be denied as to the rest of the complaint.